COPY

1    Steven E. Fineman (State Bar No. 140335)
2    Wendy R. Fleishman (*Pro Hac Vice* application anticipated)
3    LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
4    250 Hudson Street, 8th Floor
     New York, New York 10013-1413
     Telephone: 212.355.9500
5    Facsimile: 212.355.9592

FILED
CLERK, U.S. DISTRICT COURT
AUG 29 2013
CENTRAL DISTRICT OF CALIFORNIA
BY            DEPUTY

6    Kent L. Klaudt (State Bar No. 183903)
     Cecilia Han (State Bar No. 235640)
7    Lisa J. Cisneros (State Bar No. 251473)
8    LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
9    275 Battery Street, 29th Floor
     San Francisco, California 94111-3339
     Telephone: 415.956.1000
10   Facsimile: 415.956.1008

11   *Attorneys for Plaintiff Jennifer Houston*

12             UNITED STATES DISTRICT COURT

13             CENTRAL DISTRICT OF CALIFORNIA

14

15   JENNIFER HOUSTON,

16             Plaintiff,

17      vs.

18

19   MEDTRONIC, INC., a Minnesota corporation; MEDTRONIC

20   SOFAMOR DANEK, USA, INC.;

21             Defendants.

Case No. 13-01679 SVW (SHx)

**AMENDED COMPLAINT FOR DAMAGES**

(1) Fraudulent Misrepresentation and Fraud in the Inducement
(2) Strict Products Liability – Failure to Warn
(3) Strict Products Liability – Design Defect
(4) Strict Products Liability – Misrepresentation
(5) Products Liability – Negligence
(6) Breach of Express Warranty
(7) Punitive Damages

**DEMAND FOR JURY TRIAL**

AMENDED COMPLAINT FOR DAMAGES
CASE NO. 13-01679

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................ 1

PARTIES ................................................................................................... 4

JURISDICTION AND VENUE ................................................................. 4

ALLEGATIONS ....................................................................................... 5

1) The Infuse® Combination Device and FDA Approval History ........... 5

2) The Medical Device Amendments .......................................................... 8

   a) Premarket Approval ........................................................................ 8

   b) FDCA Requirements Concerning Approved Devices.............. 10

   c) MEDTRONIC's Conduct in Violation of the FDCA.............. 11

3) MEDTRONIC's Campaign of Off-Label Promotion of Infuse®........ 12

   a) Generally........................................................................................ 12

   b) Opinion Leader Dr. Thomas A. Zdeblick................................ 14

   c) Norton Hospital Leatherman Spine Center Opinion Leaders.................................................................................... 16

   d) Opinion Leader Dr. Jeffrey Wang, M.D................................. 17

   e) Walter Reed "Opinion Leaders:" Timothy Kuklo, M.D. and David Polly, M.D.................................................... 17

   f) Other Various Opinion Leaders................................................ 22

4) The Design Defect in Infuse® ............................................................... 23

5) Medtronic's Fraud and Misrepresentations as to Infuse®................. 24

   a) Fraudulent, Ghost-Written 2004 Spine Journal Article by Dr. Haid, Dr. Burkus, Dr. Branch and Dr. Alexander............. 25

   b) Fraudulent, Ghost-Written 2005 *Journal of Bone and Joint Surgery (JBJS)* Article by Dr. Burkus, et al. ................. 26

   c) Medtronic's Employees and Agents, including its Opinion Leaders, Repeated their Fraudulent and Misleading Statements in Presentations and Discussions with Physicians Nationwide ............................................. 27

   d) The Widespread Repudiation of Medtronic-Funded Studies that Touted the Safety and Efficacy of Infuse®........... 29

     ii) June 2011 Special Edition of *The Spine Journal* .......... 29

     i) June 2013 Yale Study Confirms Lack of Scientific Integrity of Medtronic-Sponsored Studies of Infuse®................................................................... 31

   e) Impact of Medtronic's Fraud................................................... 37

6) Medtronic Failed to Warn During Its Fraudulent Campaign to Sell Infuse®........................................................................... 38

7) Off-Label Use of Infuse® is Dangerous and Causes Adverse Side Effects. ............................................................... 40

AMENDED COMPLAINT FOR DAMAGES
CASE NO. 13-01679

# TABLE OF CONTENTS
## (continued)

**Page**

8)   MEDTRONIC's Prior Knowledge and Concealment of the Dangers of Off-Label Infuse® Uses. ................................................. 47

9)   Off-label Promotion of Infuse® Significantly Impacted the Market ............................................................................................ 51

10)  MEDTRONIC's Off-Label Promotion Practices Have Led to Whistleblower and Shareholder Litigation and Federal Investigations ................................................................................. 52

    a)   Whistleblower Lawsuits Resulting in a Corporate Integrity Agreement .......................................................... 52

    b)   Shareholder Derivative Action Against Medtronic. ............... 57

    c)   U.S. Senate Investigation ...................................................... 63

        i)    September 30, 2008 Letter. ......................................... 63

        ii)   June 21, 2011 Letter. .................................................. 65

        iii)  December 13, 2011 Letter ........................................... 66

11)  Allegations in Support of Punitive Damages .......................... 67

    a)   Infuse® is Profitable and thus MEDTRONIC had an Economic Motive to Promote Infuse Off-label. ..................... 69

    b)   June 1, 2011 Issue of *The Spine Journal*. ............................ 70

    c)   October 25, 2012 U.S. Senate Committee on Finance Report. .................................................................................... 74

12)  Plaintiff-specific Allegations ................................................ 75

CLAIMS FOR RELIEF ............................................................................. 79

FIRST CAUSE OF ACTION FRAUDULENT MISREPRESENTATION AND FRAUD IN THE INDUCEMENT (BY PLAINTIFF AGAINST THE MEDTRONIC DEFENDANTS) ............................................................. 79

SECOND CAUSE OF ACTION STRICT PRODUCTS LIABILITY – FAILURE TO WARN (BY PLAINTIFF AGAINST THE MEDTRONIC DEFENDANTS) ................................................................ 81

THIRD CAUSE OF ACTION STRICT PRODUCTS LIABILITY – DESIGN DEFECT (BY PLAINTIFF AGAINST THE MEDTRONIC DEFENDANTS) ................................................................................... 84

FOURTH CAUSE OF ACTION STRICT PRODUCT LIABILITY – MISREPRESENTATION (BY PLAINTIFF AGAINST THE MEDTRONIC DEFENDANTS) ................................................................ 86

FIFTH CAUSE OF ACTION PRODUCT LIABILITY – NEGLIGENCE (BY PLAINTIFF AGAINST THE MEDTRONIC DEFENDANTS) .......... 88

SIXTH CAUSE OF ACTION BREACH OF EXPRESS WARRANTY (BY PLAINTIFF AGAINST THE MEDTRONIC DEFENDANTS) ................... 90

PRAYER FOR RELIEF .............................................................................. 92

DEMAND FOR JURY TRIAL .................................................................. 94

AMENDED COMPLAINT FOR DAMAGES
CASE NO. 13-01679

1       Plaintiff JENNIFER HOUSTON ("Plaintiff") by and through her counsel

2 allege as follows:

3                                     **INTRODUCTION**

4       1.     This case involves a spinal surgery in which a bio-engineered bone

5 growth protein known as Infuse® was implanted in Plaintiff in an off-label manner.

6       2.     Infuse® is the trade name for rhBMP-2, bone morphogenetic protein.

7 In 2002 the Federal Drug Administration ("FDA") approved a Class III medical

8 device that included Infuse® as a component of the device.  The other required

9 component of the device consisted of a hollow metal cylinder called an LT-

10 CAGE™.  The device was approved for only one specific type of spine surgery -

11 one level fusion in the lumbar spine that is performed through the abdomen

12 (anterior).

13       3.     Infuse® was designed and manufactured by Defendants MEDTRONIC,

14 INC., and MEDTRONIC SOFAMOR DANEK, USA, INC. (collectively "the

15 MEDTRONIC Defendants" or "MEDTRONIC") and was illegally and improperly

16 promoted and sold by MEDTRONIC for off-label uses in spine surgery patients,

17 including in JENNIFER HOUSTON.

18       4.     Infuse® is not, and never has been, approved for use in posterior

19 approach lumbar spine surgeries or for use in multiple levels in the lumbar spine.

20 These surgeries are thus "off-label."  Despite this lack of FDA approval, Infuse®

21 was improperly promoted by MEDTRONIC to be used off-label for posterior

22 approach lumbar spine fusions, and without an LT-Cage™.

23       5.     MEDTRONIC recklessly and/or intentionally minimized and/or

24 downplayed the risks of serious side effects related to the use of Infuse®, and

25 especially those risks related to the off-label use of Infuse®, including but not

26 limited to the risk of ectopic or uncontrolled bone growth.

27

28

AMENDED COMPLAINT FOR DAMAGES
CASE NO. 13-01679

6.      After the FDA approved the Infuse® combination device, MEDTRONIC also failed to warn the agency of the growing number of adverse events due to the off label uses of Infuse® and related risks.

7.      MEDTRONIC manufactured, marketed and sold Infuse®, which was defectively designed in that it had never been approved by the FDA.  The defective design consisted of the bone morphogenetic protein alone.  Thus, this is a different design from what the FDA approved.  Accordingly, the FDA never weighed the risks versus the benefits on the misbranded design manufactured, marketed and sold by MEDTRONIC.

8.      Patients' spine surgeons, including Plaintiff's surgeon, were persuaded by MEDTRONIC and by MEDTRONIC's consultant "opinion leaders," who are paid physician promoters, to expand their use of Infuse® for off-label uses such as posterior approach lumbar fusions and cervical spine fusions.

9.      When Infuse® is used off-label, it can cause severe injuries to the patient, including Infuse®-induced bone overgrowth and other complications that often necessitate risky, painful, and costly revision surgeries, which may not cure the problems caused by the Infuse® use.

10.      This uncontrolled bone growth (also known as "ectopic" or "exuberant" bone growth) can result in severe damage to or compression of the surrounding neurologic structures in the spine, and bone can grow onto or around the spinal cord or the spinal nerve roots.  When nerves are compressed by such excessive bone growth, a patient can experience, among other adverse events, intractable pain, paralysis, spasms, and the need for revision surgery.

11.      When Infuse® is used off-label, it can cause or contribute to other serious injuries and complications, including extreme inflammatory reactions, chronic radiculitis, retrograde ejaculation, sterility, osteolysis (bone resorption), displacement or migration of the spacer cage, pseudoarthrosis, and worse overall outcomes.

AMENDED COMPLAINT FOR DAMAGES
CASE NO. 13-01679

12.     Notwithstanding overwhelming and substantial evidence (including MEDTRONIC-sponsored studies) demonstrating these increased risks of adverse reactions from off-label use of Infuse®, MEDTRONIC recklessly and/or intentionally misrepresented, minimized, downplayed, disregarded, and/or completely omitted these off-label risks while promoting Infuse to spine surgeons for off-label uses. In fact, MEDTRONIC promoted to spine surgeons and patients the use of the product in dangerous off-label procedures, thereby demonstrating a conscious disregard for the health and safety of spinal fusion patients such as the Plaintiff.

13.     Moreover, the actual rate of incidence of serious side effects from off-label use of Infuse® is, in fact, much greater than that disclosed by MEDTRONIC to spine surgeons and patients. With respect to the off-label approaches, MEDTRONIC failed to accurately disclose the significant off-label risks of which it knew or should have known.

14.     Because of MEDTRONIC's wrongful conduct in actively and illegally promoting the off-label uses of Infuse®, and because of MEDTRONIC's additional wrongful conduct in minimizing, concealing, and/or downplaying the true risks of these non-FDA approved off-label uses of its product Infuse®, thousands of spine patients, including Plaintiff, underwent surgeries without knowing the true risks inherent in the off-label use of Infuse®.

15.     These patients and their physicians relied on MEDTRONIC's false and misleading statements of material fact including statements and publications by MEDTRONIC's "opinion leaders," "thought leaders" and sales representatives. MEDTRONIC orchestrated a marketing campaign from at least 2002 to the present to persuade spine surgeons to use Infuse® in dangerous off-label uses in the spine. Indeed, absent MEDTRONIC's extensive off-label promotion campaign, physicians, such as the Plaintiff's spine surgeon, would never have performed these especially risky off-label procedures.

1      16.    As a result of the off-label use of Infuse® in her spinal surgery,

2  Plaintiff suffered bodily injuries and damages as described herein.

3                             **PARTIES**

4      17.    Plaintiff JENNIFER HOUSTON is an individual who is a resident and

5  citizen of Torrance, CA.

6      18.    Defendant MEDTRONIC, INC. is a Minnesota corporation, with its

7  principal place of business at 710 Medtronic Parkway, Minneapolis, Minnesota

8  55432.

9      19.    Defendant MEDTRONIC SOFAMOR DANEK USA, INC. is a

10  Tennessee corporation, with its principal place of business at 1800 Pyramid Place,

11  Memphis, Tennessee 38132.

12                      **JURISDICTION AND VENUE**

13      20.    This Court has subject matter jurisdiction over this action pursuant to

14  28 U.S.C. § 1332 because there is complete diversity of citizenship between

15  Plaintiff and the Defendants, and because Plaintiff alleges an amount in controversy

16  in excess of $75,000, exclusive of interest and costs.

17      21.    The Court has personal jurisdiction over Defendants because at all

18  relevant times they have engaged in substantial business activities in the State of

19  California. At all relevant times the MEDTRONIC Defendants transacted, solicited,

20  and conducted business in California through their employees, agents, and/or sales

21  representatives, and derived substantial revenue from such business in California.

22      22.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)

23  because a substantial portion of the wrongful acts upon which this lawsuit is based

24  occurred in this District. Venue is also proper pursuant to 28 U.S.C. § 1391(c)

25  because Defendants are all corporations that have substantial, systematic, and

26  continuous contacts in the Central District of California and they are all subject to

27  personal jurisdiction in this District.

28

## ALLEGATIONS

**1)** **The Infuse® Combination Device and FDA Approval History**

23.     On July 2, 2002, the FDA granted Medtronic's premarket approval application (PMA) for the "InFUSE® Bone Graft/LT-CAGE™ Lumbar Tapered Fusion Device."  Exhibit A, FDA PMA Approval Letter at 1.  For the sake of brevity, Plaintiff refers to this approved device as the Infuse® combination device.

24.     The FDA's approved description of the combination device stated,

> The InFUSE™ Bone Graft/LT-CAGE™ Lumbar Tapered Fusion Device consists of two components containing three parts-a tapered metallic spinal fusion cage, a recombinant human bone morphogenetic protein and a carrier/scaffold for the bone morphogenetic protein and resulting bone.

Exhibit B, FDA Approved Label at 1.

25.     The FDA also requires that both components of the Infuse® combination device are used together: "These components must be used as a system.  The InFuse™ Bone Graft component must not be used without the LT-CAGE™ Lumbar Tapered Fusion Device component."  *Id.*

26.     The cage component maintains the spacing and temporarily stabilizes the diseased region of the spine, while the Infuse® bone graft component is used to form bone, which is intended to permanently stabilize (fuse) this portion of the spine.

27.     The FDA identified rhBMP-2 as the active ingredient in the InFUSE™ Bone Graft component." *Id.* at 2.  As noted in the Introduction to this Amended Complaint, Plaintiff refers to the bio-engineered bone growth protein, rhBMP-2, as "Infuse®."  During surgery, Infuse® is soaked onto and is intended to bind with the absorbable collagen sponge that is designed to resorb, or disappear, over time.  As the sponge dissolves, Infuse® stimulates the cells to produce new bone.

28.     Certain bone morphogenetic proteins ("BMP"s) have been studied for decades because of their ability to heal bone and potentially decrease or eliminate the need for bone graft harvesting from other parts of the body.  Scientists isolated

AMENDED COMPLAINT FOR DAMAGES
CASE NO. 13-01679

the gene for one protein (rhBMP-2) from bone tissue and used molecular biology techniques to create genetically engineered cells that produce large quantities of rhBMP-2.

29.     Thus, Infuse® is an alternative or supplement to other grafting materials to help fuse vertebrae in the lower (lumbar) spine to treat degenerative disc disease.  For years, autologous bone graft has been considered the "gold standard" in fusion surgery.  In an autologous bone graft — or "autograft" — the surgeon procures bone graft material from another part of the patient's body, typically from the patient's pelvis or iliac crest, and implants the bone graft in the site where fusion is desired.  Successful fusions occur at significantly high rates in autograft procedures, as the harvested bone exhibits all the properties necessary for bone growth.  As an alternative to autograft, patients can undergo an "allograft" procedure.  In an allograft procedure bone is taken from the cadavers of deceased people who have donated their bone to so called "bone banks."  Bio-engineered and bio-manufactured bone-growth materials, including Infuse®, provide a newer option to both traditional bone graft procedures.

30.     Attempting to seize on this potentially lucrative opportunity to develop a bio-engineered bone-growth protein, Sofamor Danek Group, Inc., a Memphis, Tennessee-based spinal device maker ("Sofamor Danek"), acquired the exclusive rights to rhBMP-2 for spinal applications in February 1995.  In October 1996, Sofamor Danek filed with the FDA an application for an Investigational Device Exemption to conduct a pilot study on the effects of rhBMP-2 in humans, marking the first step to obtaining approval to commercially market BMP.  In January 1999, MEDTRONIC purchased Sofamor Danek for $3.6 billion.

31.     When the FDA approved the Infuse® combination device in 2002, it did so for one specific spinal fusion procedure.  According to the FDA's PMA approval, the Infuse® combination device can only be used in an Anterior Lumbar Interbody Fusion ("ALIF") procedure, involving a single-level fusion in the L4-S1

AMENDED COMPLAINT FOR DAMAGES
CASE NO. 13-01679

region of the lumbar spine.  Ex. A, FDA PMA Approval Letter at 1; Ex. B, FDA Approved Label at 3.  ALIF is performed by approaching the spine from the front of the body through an incision in the abdomen and is primarily used to treat pain resulting from degenerative disc disease.[1]

32.     The use of Infuse® for posterior lumbar fusion surgery has never been approved by the FDA.[2]  Likewise, the FDA has never approved the use of Infuse® in spinal fusion surgeries without an LT-CAGE™.  Thus, the use of Infuse® in either manner consists of an off-label use.

33.     Physicians may use FDA-approved medical devices in any way they see fit — either on-label or off-label, but, as explained in greater detail below, medical device companies are prohibited by federal law from promoting off-label uses for their medical devices.  Such promotion to physicians or patients any off-label use of Infuse® constitutes misbranding.

34.     During the FDA Advisory Committee Panel ("FDA Panel") hearing on January 10, 2002 concerning potential FDA approval of Infuse®, Panel members voiced concerns regarding potential off-label use of the product, and asked MEDTRONIC to describe its efforts to guard against off-label use of the product.

35.     In response to FDA concerns of off-label applications, one MEDTRONIC consultant, who is alleged to have received hundreds of thousands of dollars in the form of kickbacks from consulting agreements promoting Infuse®, dismissed the FDA Panel's concerns of off-label use, stating: "this specific

---

[1]  While the product's label remains substantially the same as that approved by the FDA in 2002, the FDA has made minor amendments to the label through post-approval supplements.  For example, on July 29, 2004, the FDA approved a supplement expanding the indicated spinal region from L4-S1 to L2-S1 and later granted approval for uses in certain oral maxillofacial surgeries.

[2]  There are numerous other lumbar spine surgical procedures for which Infuse® was not approved, and for which it has never been approved, such as Posterior Lumbar Interbody Fusion ("PLIF"), Posterolateral Fusion and Transforaminal Lumbar Interbody Fusion ("TLIF"), and these uses of the Infuse® would also be considered off-label.

AMENDED COMPLAINT FOR DAMAGES
CASE NO. 13-01679

1  application before the panel today is through an anterior approach," and thus,

2  "seems to me to be outside the scope of what we ought to be focusing on today."

3       36.    Reiterating its concerns on off-label use, the FDA Panel cautioned

4  MEDTRONIC to guard against procedures outside the specifically approved ALIF

5  procedure provided in the labeled application. The FDA Panel's admonishment

6  included concerns voiced by Panel member Dr. John Kirkpatrick that off- label use

7  could result in harm to patients. More specifically, the use of the ***tapered*** LT-

8  Cage™ — which is difficult to implant in a posterior approach—would, if required,

9  "prevent a majority of surgeons from applying this from a Posterior Lumbar

10  Interbody Fusion [PLIF] perspective." In other words, the FDA explicitly warned

11  MEDTRONIC against promoting Infuse® for use in off- label PLIF procedures

12  because, according to the statements of the FDA Panel, such use could endanger

13  patients.

14  **2)**    **The Medical Device Amendments**

15      **a)**    **Premarket Approval**

16       37.    The Medical Device Amendments of 1976 ("MDA") to the FDCA

17  established the current regulatory framework for medical device approval.

18  The MDA contains a three-class classification system for medical devices. Class I

19  devices pose the lowest risk to consumers' health, do not require FDA approval for

20  marketing, and include devices such as tongue depressors. Class II devices pose

21  intermediate risk and often include special controls including post-market

22  surveillance and guidance documents. Finally, Class III devices pose the greatest

23  risk of death or complications and include most implantable surgical devices such

24  as cardiac pacemakers, coronary artery stents, automated external defibrillators, and

25  several types of implantable orthopedic devices for spine and hip surgery. Infuse® is

26  a Class III device.

27       38.    Manufacturers such as MEDTRONIC seeking to market Class III

28  devices, such as Infuse®, are required to submit a Premarket Approval Application

AMENDED COMPLAINT FOR DAMAGES
CASE NO. 13-01679

1   ("PMA") that must be evaluated and approved by the FDA. The PMA requires the

2   manufacturer to demonstrate the product's safety and efficacy to the FDA through a

3   process that analyzes clinical and other data, including: (1) technical data and

4   information on the product, including non-clinical laboratory studies and clinical

5   investigations; (2) non-clinical laboratory studies that provide information on

6   microbiology, toxicology, immunology, biocompatibility, stress, wear, shelf life,

7   and other laboratory or animal tests of the device—all of which must be conducted

8   in compliance with federal regulations which set forth, *inter alia*, criteria for

9   researcher qualifications, facility standards and testing procedures; and (3) clinical

10  investigations in which study protocols, safety and effectiveness data, adverse

11  reactions and complications, device failures and replacements, patient information,

12  patient complaints, tabulations of data from all individual subjects, results of

13  statistical analyses, and any other information from the clinical investigations are

14  provided, including the results of any investigation conducted under an

15  Investigational Device Exemption ("IDE").

16         39.    A PMA requires that all pertinent information about the device be

17  articulated in the application and requires the manufacturer to specify the medical

18  device's "intended use." The indications for use required on the label are based on

19  the nonclinical and clinical studies described in the PMA. Indications for use for a

20  device include a general description of the disease or condition the device will

21  diagnose, treat, prevent, cure, or mitigate, including a description of the patient

22  population for which the device is intended.

23         40.    In addition, each PMA submission must include copies of all proposed

24  labeling for the device, which must comply with federal requirements. Specifically,

25  the label must include the common name of the device, quantity of contents, and

26  the name and address of the manufacturer, as well as any prescription use

27  restrictions, information for use (including indications, effects, routes, methods, and

28  frequency and duration of administration; and any relevant hazards,

AMENDED COMPLAINT FOR DAMAGES
CASE NO. 13-01679

1   contraindications, side effects, and precautions), instructions for installation and

2   operation, and any other information, literature, or advertising that constitutes

3   "labeling" under the FDCA. Approval of the product's labeling is conditioned on

4   the applicant incorporating any labeling changes exactly as directed by the FDA,

5   and a copy of the final printed labeling must be submitted to the FDA before

6   marketing.

7       41.     Ultimately, the FDA's detailed safety and effectiveness evaluation is

8   strictly tied to the manufacturer's intended use of the device. 21 U.S.C. §

9   360c(a)(2). The FDA looks only at the "safety and effectiveness of a device . . .

10  with respect to the persons for whose use the device is represented or intended, with

11  respect to the conditions of use prescribed, recommended, or suggested in the

12  labeling of the device, and weighing any probable benefit to health from the use of

13  the device against any probable risk of injury or illness from such use." *Id.* Thus the

14  FDA looks at the use of a device within the parameters defined by the

15  manufacturer. *See id.*; *id.* § 360e(c)(1) (describing how the Secretary can deny

16  approval based on the safety and effectiveness of the device "under the conditions

17  of use prescribed, recommended, or suggested in the proposed labeling thereof").

18      **b)     FDCA Requirements Concerning Approved Devices**

19      42.     Apart from the PMA process, the FDCA and related regulations set

20  forth other requirements concerning Class III medical devices.  After a

21  manufacturer has specified and the FDA has approved a device for the intended

22  use, the FDA regulates the manner in which the manufacturer designs,

23  manufactures, labels, and markets the device going forward.

24      43.     Though, the FDA has no authority to prohibit a physician from

25  prescribing or administering the use of any FDA-approved device in any manner he

26  or she deems medically appropriate, 21 U.S.C. § 396, the FDCA does prohibit a

27  manufacturer from promoting a use of the product that is not the specified use.  21

28  U.S.C. § 331(a); *see also* 21 C.F.R. § 814.80 (providing that a device "may not be

AMENDED COMPLAINT FOR DAMAGES
CASE NO. 13-01679

1  . . . advertised in a manner that is inconsistent with any conditions to approval

2  specified in the PMA approval order for the device.")

3       44.     A product is "misbranded" when the directions and indications for the

4  unapproved uses that the manufacturer "intends" the product to be used for have not

5  been included on the label. *See* 21 C.F.R. §801.4. Further, a device's intended uses

6  are evidenced by the manufacturers' conduct, not by reference to what the FDA has

7  approved. *Id.* A product's intended uses can be derived from oral statements by

8  persons speaking on behalf of a company about its product. In other words, a

9  manufacturer can be liable under the FDCA if its conduct demonstrates intent to

10  encourage product use inconsistent with or outside the scope of the product's

11  approved label. *Id.*

12       45.     The FDCA requires medical device manufacturers to disclose all

13  material facts in advertising, 21 U.S.C. §321(n). A manufacturer who wishes to

14  modify the labeling, packaging, design, or indications for use of its device has to

15  comply with a supplemental PMA process. 21 C.F.R. § 814.39(a).

16       46.     Further, the FDCA subjects approved devices to reporting

17  requirements. 21 U.S.C. § 360i. For example, the manufacturer must update the

18  FDA when it learns of investigations or scientific studies concerning its device, 21

19  C.F.R. § 814.84(b)(2), or incidents where the device—used in any manner—"[m]ay

20  have caused or contributed to a death or serious injury," either due to malfunction

21  or normal operation, *id.* § 803.50(a). The FDA can revoke its approval based on

22  these post-approval reports. 21 U.S.C. §§ 360e(e)(1), 360h(e). The manufacturer

23  must establish internal procedures for reviewing complaints and event reports. 21

24  C.F.R. § 820.198(a).

25       **c)**   **MEDTRONIC's Conduct in Violation of the FDCA**

26       47.     MEDTRONIC violated these FDCA statutes and accompanying

27  regulations by falsely and misleadingly promoting Infuse® for off-label uses,

28  misbranding Infuse®, failing to report to the FDA adverse events, and failing to

AMENDED COMPLAINT FOR DAMAGES
CASE NO. 13-01679

1 submit a supplemental approval to account for the new intended use and design of

2 Infuse® .

3       48.    MEDTRONIC's violation of these FDCA statutes and accompany

4 regulations, as discussed above, constitutes violation of the state law tort causes of

5 action alleged in this Complaint, as set forth below.

6       49.    MEDTRONIC's violation of the FDCA statutes and accompany

7 regulations, as discussed above, directly caused or significantly contributed to the

8 off-label use of Infuse® generally, and directly caused or significantly contributed

9 to the off-label use of Infuse® in this particular Plaintiff, and MEDTRONIC's

10 misconduct in this regard thus caused or contributed to Plaintiff's injuries and

11 damages.

12 **3)**     **MEDTRONIC's Campaign of Off-Label Promotion of Infuse®**

13     **a)**     **Generally**

14       50.    In spite of the very specific and limited FDA approval of Infuse® ,

15 MEDTRONIC has successfully (and profitably) increased off-label sales of Infuse®

16 through "consulting" and royalty agreements with physicians and off-label

17 promotion efforts by its sales representatives.  MEDTRONIC paid outside

18 physician "Opinion Leaders" handsome sums in return for publishing studies and

19 medical journal articles which downplayed and concealed the risks of adverse

20 events from off-label use while actively promoting off-label use of Infuse®,

21 delivering presentations explaining, endorsing, and promoting off-label applications

22 of the product, and directly advocating off-label uses of Infuse® to other spine

23 surgeons, while minimizing the risks or dangers to patients from these uses.

24       51.    Medical device companies, including MEDTRONIC, look for

25 surgeons who are known as "Opinion Leaders" and who will not only use a high

26 volume of their products, but who can and will persuade other surgeons to use a

27 particular device.  Opinion leaders are physicians whose opinions on medical

28 procedures and medical devices are held in high regard by other surgeons.  If these

influential physicians are willing to promote the use of a certain device, then other surgeons are likely to follow suit and use that device, sometimes including off-label uses which are illegal for the company itself to promote.

52.    Prior to the date of Plaintiff's spine surgery which involved off-label Infuse®, MEDTRONIC provided millions of dollars in sometimes undisclosed payments to certain spine surgeon Opinion Leaders who published articles in medical journals, delivered presentations at continuing medical education courses, and appeared at consulting engagements to promote off-label applications of Infuse® in the spine.  "Medtronic paid a total of approximately $210 million to physician authors of Medtronic-sponsored studies from November 1996 through December 2010 for consulting, royalty, and other miscellaneous arrangements." *Staff Report on Medtronic's Influence on Infuse Clinical Studies*, U.S. Senate Committee on Finance, October 25, 2012.  MEDTRONIC, while providing spine surgeons with MEDTRONIC-funded studies and published articles purporting to support the efficacy and safety of the off-label uses, simultaneously and systematically concealed or downplayed other non-MEDTRONIC-funded studies and articles demonstrating serious and frequent adverse events caused by the same off-label uses.

53.    MEDTRONIC's sales force directed other physicians to Opinion Leaders, as well as their written work (paid for by MEDTRONIC) to further drive off-label sales of Infuse®.  Certain sales representatives went so far as to recommend dosages of Infuse® in risky off-label procedures, and guide surgeons through off-label uses of the product during surgery.

54.    In this way, and as described in greater detail below, MEDTRONIC consciously and deliberately orchestrated a campaign to end-run the FDA's 2002 approval of and labeling for the Infuse® device.  Indeed, even after a settlement with the Department of Justice as a result of this very activity, MEDTRONIC continued its practice of providing lucrative consulting fees (amounting to millions of dollars

1    per year) to surgeons who actively promoted off-label use of Infuse®, often with

2    direct involvement by MEDTRONIC's senior management.

3         55.     The federal judiciary has recognized a genuine risk that financial

4    conflicts of interest induce bias in scientific research.  The Federal Judicial Center's

5    key reference guide for judges considering scientific issues in their cases explains,

6    "Judges and juries . . . must consider financial conflicts of interest when assessing

7    scientific testimony.  The threshold for pursing the possibility of bias must be low."

8    Reference Manual on Scientific Evidence (Third) Preface (2011).  In addition,

9    research published in the *New England Journal of Medicine*, as well as other

10   surveys, show that information brought by industry representatives to physicians

11   impacts medical decision-making.  Thus, the comprehensive off-label,

12   unsubstantiated and otherwise misleading marketing of Infuse® to physicians,

13   including Plaintiff's surgeon, guided by MEDTRONIC's goal of expanding the

14   market for Infuse® beyond FDA-approved uses, exposed patients, including

15   Plaintiff, to an increased risk of bone overgrowth, radiculitis and other

16   complications from their spinal fusion surgeries.

17        **b)**     **Opinion Leader Dr. Thomas A. Zdeblick**

18        56.     Thomas A. Zdeblick, M.D., the Chairman of the Department of

19   Orthopedics and Rehabilitation at the University of Wisconsin, received substantial

20   sums from MEDTRONIC; he was paid over $19 million from MEDTRONIC from

21   2003 to 2007 for consulting services and royalty payments.  Although Dr. Zdeblick

22   only disclosed annual payments exceeding $20,000 in University conflict of interest

23   forms, he actually received between $2.6 and $4.6 million per year.  In 2007 alone,

24   Dr. Zdeblick received $2,641,000 in consulting fees from MEDTRONIC.  From

25   1998 through 2004, Dr. Zdeblick was paid an annual salary of $400,000 by

26   MEDTRONIC under a contract that only required him to work eight days per year

27   at a MEDTRONIC site in Memphis, Tennessee, and to participate in "workshops"

28   for surgeons.

57.     Dr. Zdeblick has been a significant contributor to MEDTRONIC's promotion of Infuse®, authoring seven peer-reviewed articles on rhBMP-2 and appearing as a presenter at medical conferences and symposia in which the topics included discussion of off-label uses of the product. On a MEDTRONIC-owned website, "www.Back.com," Dr. Zdeblick describes the advantages of Infuse® and appears in an online video discussing the benefits of the product.

58.     As discussed more fully *supra*, on January 16, 2009, *The Wall Street Journal* reported on a letter sent by Senator Charles Grassley to Kevin P. Reilly, President at the University of Wisconsin, regarding Defendants' consulting and royalty payments to Dr. Zdeblick, who co-authored preliminary studies that led to the FDA's approval of Infuse®. Although the University is required to monitor its researchers' financial conflicts-of-interest, the amounts MEDTRONIC paid Dr. Zdeblick far exceeded those he reported to the University. Specifically, Dr. Zdeblick was required to disclose annual amounts in excess of $20,000 per year, and in one year reported payments in excess of $40,000. In reality, Dr. Zdeblick received between $2.6 million and $4.6 million per year from MEDTRONIC, totaling an astonishing $19 million in payments, from 2003 through 2007.

59.     As revealed in a June 20, 2009 article in the *Milwaukee Journal Sentinel*, Dr. Paul A. Anderson, an orthopedic surgeon and colleague of Dr. Zdeblick at the University of Wisconsin School of Medicine and Public Health, was paid $150,000 by MEDTRONIC for just eight days of work. Dr. Anderson, along with MEDTRONIC consultants Drs. Boden, Keith H. Bridwell, and Jeffrey C. Wang, authored a July 2007 article in *Journal of Bone and Joint Surgery* article, titled "What's New in Spine Surgery." The article discussed, among other things, a study that examined the use of Infuse® in an off- label Posterolateral Fusion procedure. According to the authors, the study reported that Infuse® improved fusion rates when used in combination with iliac crest bone graft in a procedure in which the BMP was wrapped around local bone as a bulking agent. According to

1    the authors, the study's findings suggested that "the current [Infuse®] kit, while

2    likely not sufficient as a stand-alone graft substitute for the posterolateral spine, can

3    provide a significant enhancer effect, improving the success of an autogenous bone

4    graft."

5         60.    On June 20, 2009, the *Milwaukee Journal Sentinel* reported that,

6    during calendar year 2008, MEDTRONIC paid Dr. Zdeblick $2 million in royalty

7    payments for eight days of consulting work, and that Dr. Paul Anderson received

8    $150,000 in MEDTRONIC consulting fees for working just eight days.

9         **c)    Norton Hospital Leatherman Spine Center Opinion Leaders**

10        61.    Another set of highly compensated surgeons, those affiliated with the

11   Norton Hospital Leatherman Spine Center in Louisville, Kentucky, collectively

12   received more than one million dollars in consulting fees in 2006 alone, including

13   Drs. John R. Johnson ($162,750), Steven D. Glassman ($200,300), Rolando M.

14   Puno ($106,000), John R. Dimar, II ($192,300), David Rouben ($109,300), Mitch

15   Campbell ($212,000) and Mladen Djurasovic ($55,900).  These same

16   MEDTRONIC-funded surgeons have written extensively on off-label uses of

17   Infuse®.  These surgeons have collectively authored at least 15 articles addressing

18   the use of bone morphogenetic proteins (BMPs), including many of the early

19   medical articles on the use of Infuse® in off-label posterolateral lumbar and anterior

20   cervical fusion procedures.

21        62.    A confidential witness in a qui tam action, described in greater detail

22   below, specifically Confidential Witness 1 ("CW1"), has testified that several

23   surgeons from the Leatherman Spine Center were requested by MEDTRONIC to

24   speak at MEDTRONIC-sponsored physician talks attended by between ten and

25   twenty-five surgeons, including several "pretty high profile" physicians.  At these

26   physician talks, a MEDTRONIC consultant, such as one of the surgeons at the

27   Leatherman Spine Center, provided presentations covering the purported benefits of

28   off-label usage of Infuse®.  According to CW 1, "What [MEDTRONIC] would do

AMENDED COMPLAINT FOR DAMAGES
CASE NO. 13-01679

is bring in one of their 'paid consultants' and set up a dinner in the area and invited a number of physicians to attend." The guest surgeon—the "paid consultant"— would then "basically give a presentation on off-label usage." Importantly, these physician talks were also attended by all MEDTRONIC sales representatives who worked in the area.

**d)  Opinion Leader Dr. Jeffrey Wang, M.D.**

63.     Another prominent MEDTRONIC consultant, Jeffrey Wang, M.D., the Chief of Spine Surgery for the Department of Orthopaedic Surgery and Executive Co-Director of the University of California, Los Angeles's ("UCLA") Comprehensive Spine Center, also spoke about off-label uses of Infuse®.  Dr. Wang received $275,000 in royalty and consulting payments from MEDTRONIC from 2003 until 2008.

64.     Furthermore, Dr. Wang failed to disclose his substantial financial relationship with MEDTRONIC while researching MEDTRONIC products, which violated UCLA's policy requiring him to do so.  For example, on a disclosure form to UCLA dated January 10, 2007, Dr. Wang checked "no" when asked if he received income of $500 or more from MEDTRONIC, notwithstanding the fact that MEDTRONIC was, at that very moment, funding one of Dr. Wang's studies.  In fact, Dr. Wang received $14,600 on January 4, 2007 for "lecture and teachings at spine meetings and universities in Korea for one week."  As a result of his repeated failures to disclose payments received from MEDTRONIC, Dr. Wang lost his position as Executive Co-Director of UCLA's Comprehensive Spine Center.

**e)  Walter Reed "Opinion Leaders:" Timothy Kuklo, M.D. and David Polly, M.D.**

65.     Former Chief of Orthopaedic Surgery at Walter Reed Army Medical Center ("Walter Reed") Dr. Timothy Kuklo was another of MEDTRONIC's highly compensated "consultants."  During his eight years of consulting for MEDTRONIC, Dr. Kuklo was handsomely rewarded for downplaying concerns of

1    adverse events caused by Infuse®, promoting unreasonably dangerous off-label uses

2    to his fellow surgeons, and publishing falsified medical research in peer-reviewed

3    medical journals.  Dr. Kuklo received over $800,000 in fees from 2001 to 2009 for

4    consulting, speaking, travel, and training services, the vast majority of which was in

5    the years following the DOJ settlement.

6          66.    On September 28, 2006, Dr. Kuklo baldly misrepresented the

7    seriousness of adverse effects associated with the off-label use of Infuse® cervical

8    spine when he appeared as a "distinguished guest surgeon" at a MEDTRONIC

9    Spine Division Business Overview Conference Call. He, alongside fellow

10   MEDTRONIC consultant Dr. Rick Sasso, who received $150,000 in consulting

11   fees in 2006, responded to concerns raised by a Merrill Lynch analyst, who asked

12   about "issues that have come up in the past in terms of potential side effects with

13   using Infuse® in the cervical region."  Both doctors dismissed these concerns,

14   attributing the problems exclusively to dosage error and concealing the true cause.

15         67.    In August 2008, Dr. Kuklo published a study in *The Journal of Bone*

16   *and Joint Surgery* comparing clinical outcomes of tibial fracture patients requiring

17   fusions. The article reported sixty-seven (67) patients received a traditional

18   autogenous bone graft, while sixty-two (62) were treated with Infuse® (some of

19   which were off-label uses), and claimed the Infuse® group had "strikingly" better

20   outcomes than patients receiving the autogenous bone graft. Specifically, the

21   autograft group had successful fusions in 76% of procedures, while the union rate

22   for the Infuse® group was significantly better at 92%.

23         68.    Dr. Kuklo claimed patients who received Infuse® experienced

24   favorable outcomes in other clinical measures as well.  Specifically, the study

25   concluded that "the primary outcome measures of union, rate of infection, and

26   reoperation were all improved with rhBMP-2," and that those treated with Infuse®

27   had a "strikingly lower infection rate (3.2%), which we believe is directly

28   attributable to rhBMP-2."

AMENDED COMPLAINT FOR DAMAGES
CASE NO. 13-01679

1        69.    On May 13, 2009, *The New York Times* reported that the U.S. Army

2   had concluded an investigation into Dr. Kuklo's study touting the benefits of

3   Infuse® to treat wounded soldiers injured in Iraq and concluded he had falsified the

4   entire study.  Col. J. Edwin Atwood, the physician who led the Army's inquiry,

5   described as "the ultimate tragedy and catastrophe in academic medicine."

6        70.    The true facts regarding Dr. Kuklo's study were only uncovered when

7   one of the study's supposed "co-authors," Lt. Col. Romney C. Andersen, was

8   congratulated on its publication by a colleague. After this discovery, Lt. Col.

9   Andersen alerted Army investigators who found that:

10          a.    Dr. Kuklo listed four other Army surgeons as "co-authors"

11   without their knowledge, and none of whom participated in or reviewed the article's

12   preparation or submission for publication;

13          b.    The signatures of the four physicians listed as co-authors on the

14   copyright release forms submitted to *The Journal of Bone and Joint Surgery* were

15   forged by Dr. Kuklo;

16          c.    Contrary to Army policy, Dr. Kuklo did not obtain publication

17   review or clearance from Walter Reed prior to submitting the article for

18   publication; and

19          d.    The published results of the article suggested a much higher

20   efficacy rate for Infuse® than is supported by the experience of the purported co-

21   authors.

22          e.    The number of cases cited by Dr. Kuklo in the article differed

23   from the number of cases contained in the U.S. Army's wartime casualty database,

24   with no explanation for the discrepancies in the article. Indeed, according to one of

25   the Army's investigators, Col. Norvell V. Coots, the study cited higher numbers of

26   patients and injuries than the hospital could account for having as patients.

27   According to Col. Coots, "It's like a ghost population that were reported in the

28

AMENDED COMPLAINT FOR DAMAGES
CASE NO. 13-01679

1    article as having been treated that we have no record of ever having existed … this

2    really was all falsified information."

3            71.      *The Journal of Bone and Joint Surgery*, after receiving correspondence

4    from Walter Reed dated November 6, 2008 disclosing the findings of their

5    investigation, formally retracted the article and banned Dr. Kuklo from submitting

6    further papers to journal.

7            72.      MEDTRONIC continued to pay Dr. Kuklo as a consultant even after

8    his article was discovered to be largely fabricated and thus retracted by *The Journal*

9    *of Bone and Joint Surgery*. Indeed, MEDTRONIC only placed Dr. Kuklo on

10   "inactive status" after the story was published in *The New York Times*.  By this

11   time, Dr. Kuklo had given countless presentations on behalf of MEDTRONIC

12   about off-label use of the product.

13           73.      As noted in a May 19, 2009 follow-up article in *The New York Times*,

14   when questioned about its ties to Dr. Kuklo, MEDTRONIC repeatedly declined to

15   disclose when it began its financial relationship with him or the extent of funding it

16   provided.  MEDTRONIC also failed to disclose its relationship with Dr. Kuklo to

17   Senator Grassley during his inquiry.

18           74.      Another highly compensated MEDTRONIC consultant involved in the

19   promotion of off-label Infuse® use, Dr. David Polly, a professor and Chief of the

20   Spine Service at the University of Minnesota Department of Orthopaedic Surgery,

21   received consulting fees from MEDTRONIC totaling $1.14 million from 2003 to

22   2007. As with Dr. Kuklo, Dr. Polly was not mentioned in MEDTRONIC's

23   disclosure list to Senator Grassley, and as with Dr. Kuklo, MEDTRONIC's

24   financial relationship with Dr. Polly began while the surgeon was on active military

25   duty at Walter Reed.

26           75.      Although Dr. Polly has claimed that his consulting relationship with

27   MEDTRONIC did not begin until 2004, documents obtained through requests

28   under the Freedom of Information Act ("FOIA") reveal that MEDTRONIC paid

AMENDED COMPLAINT FOR DAMAGES
CASE NO. 13-01679

1   almost $30,000 in travel expenses for Dr. Polly to speak at various medical

2   conferences in the Bahamas, San Diego, and a $10,000 trip to Switzerland, while he

3   was stationed at Walter Reed in 2003. Dr. Polly attended these conferences to

4   report on his research that purportedly demonstrated that Infuse® was more cost

5   effective than traditional spinal fusion procedures.

6          76.    According to an article co-authored by Drs. Polly and Kuklo published

7   in the November 2004 issue of "Minnesota Medicine," rhBMP-2 was used in more

8   than 100 military patients with traumatic bone fractures who had served in Iraq and

9   Afghanistan. Although the use of Infuse® in tibial fractures was not approved until

10  April 30, 2004, Dr. Polly reported that the "decision to use rhBMP-2 was made

11  early in the Afghanistan conflict and was based on evidence from clinical trials in

12  Europe on open tibial fractures that suggested use of rhBMP-2 not only improved

13  bone healing but led to a decreased number of secondary interventions and lower

14  rates of infection." According to Dr. Polly, "the military's experience with rhBMP-

15  2 has been favorable."

16         77.    MEDTRONIC reimbursed Dr. Kuklo for a meeting with

17  MEDTRONIC representatives in Memphis, Tennessee on April 20, 2004 regarding

18  "Review of BMP Trauma and Spine Surgery" prior to the November 2004 article

19  being published.

20         78.    In May 2006, Dr. Polly, seeking a government grant for a similar

21  research into the use of Infuse® and antibiotics to treat traumatic and infected bone

22  fractures, testified before the Defense Subcommittee of the U.S. Senate

23  Appropriations. Dr. Polly stated that he was "speaking on behalf of the American

24  Academy of Orthopedic Surgeons." However, according to information recently

25  released by Senators Grassley and Baucus, Dr. Polly actually billed MEDTRONIC

26  $7,000 in connection with his Senate testimony. Therefore, Dr. Polly was speaking

27  on behalf of MEDTRONIC, not the American Academy of Orthopedic Surgeons,

28  as he had claimed. Furthermore, Dr. Polly billed MEDTRONIC a total of $50,000

1   over several months for his lobbying efforts in securing the $466,644 Department

2   of Defense grant for this Infuse® research study. Additionally, from July 2005 to

3   September 2007, Dr. Polly repeatedly billed MEDTRONIC for his frequent

4   meetings, telephone calls, and email correspondence with numerous MEDTRONIC

5   senior executives, billing reports which MEDTRONIC approved.

6                        **f)**   **Other Various Opinion Leaders**

7        79.    Several physicians who authored a May 2003 article describing

8   positive results of Infuse® used in the cervical spine were paid tens of thousands of

9   dollars in consulting fees by MEDTRONIC.  The article, "New Technologies in

10  Anterior Cervical Spine Fixation," published on SpineUniverse, a website intended

11  for the general public that provides information regarding spinal disorders and

12  treatment, described the physicians' use of Infuse® "in the cervical spine with very

13  good results." According to the authors, "[p]reliminary results are promising and

14  Infuse® may be especially appropriate in people undergoing multiple level fusions"

15  (emphasis added)—i.e., for indications outside FDA limited approval to single-

16  level fusion procedures.

17       80.    One of the authors of this article, Dr. Regis Haid, Jr., received

18  consulting fees of $50,000 from MEDTRONIC in 2006 and similar amounts in the

19  previous two years. Another author, Dr. Gerald Rodts, received payments of

20  $80,000 from MEDTRONIC in 2006 and similar amounts in the previous two

21  years. The SpineUniverse article does not mention that its authors received

22  compensation from MEDTRONIC, nor do the website profiles of Dr. Haid and Dr.

23  Rodts, both of whom serve on the publication's editorial board, disclose their

24  financial ties to MEDTRONIC.

25       81.    Dr. Haid was also the lead author of an article describing the results of

26  the study of Infuse® in off-label PLIF procedures that was halted in December 1999

27  after several patients experienced adverse incidents of uncontrolled bony

28  overgrowth.  In addition, two of the article's other authors—Dr. J. Kenneth Burkus

-22-                                                AMENDED COMPLAINT FOR DAMAGES
                                                    CASE NO. 13-01679

1    and Dr. Charles L. Branch—received consulting fees from MEDTRONIC.

2    Specifically, MEDTRONIC paid Dr. Branch $154,900 in 2006 and similar amounts

3    in the preceding two years, while Dr. Kenneth Burkus—who has written over a

4    dozen articles addressing the use of rhBMP-2, including studies examining the use

5    of Infuse® in off- label PLIF and anterior cervical procedures—received $416,775

6    in 2006 and similar amounts in the two preceding years.

7            82.    CW 1 stated that Drs. Lawrence "Larry" G. Lenke and Keith H.

8    Bridwell, two surgeons from Washington University in St. Louis – where Dr.

9    Kuklo worked as an associate professor until recently – similarly acted as "Opinion

10   Leaders" or "guest surgeons" during "corporate visits" in which MEDTRONIC

11   would invite targeted surgeons to attend training sessions in Memphis, Tennessee.

12   While in Memphis, the visiting surgeons met with MEDTRONIC corporate

13   officers, product managers, and guest surgeons, such as Drs. Lenke and Bridwell.

14   The visiting surgeons also received "hands-on training" on Infuse®, including

15   instruction in cadaver labs. According to CW1, who personally attended two such

16   meetings, "[t]here was training on off- label procedures, for sure." The visiting

17   surgeons "would bring up the use of Infuse® and ask how to use it, and [the guest

18   surgeons] would show them how to do it." CW1 stated that MEDTRONIC chose

19   which surgeons to invite to these corporate visits based, in part, upon the volume of

20   Infuse® procedures they performed.

21   **4)    The Design Defect in Infuse®**

22           83.    Despite the fact that the FDA only approved Infuse® for use in the

23   spine in combination with use of the LT-CAGE™, MEDTRONIC has designed and

24   sold Infuse® separately from the LT-CAGE™.

25           84.    By designing Infuse® for sale without the LT-CAGE™ and promoting

26   and selling it as such, MEDTRONIC has unlawfully designed, manufactured,

27   marketed and sold a new device for which the FDA never weighed the risk versus

28   the benefit and never approved.

85.     Moreover, this new device presents risks and dangers that render it defective.

86.     MEDTRONIC was required, but failed, to apply for supplemental pre-market approval from the FDA due to changes in the design specifications and components of the Infuse® combination device.

87.     As a result, the Infuse® implanted in Plaintiff JENNIFER HOUSTON without the LT-CAGE™ did not perform as safely as an ordinary consumer would have expected it to perform when used or misused in an intended or reasonably foreseeable way, based on the FDA's approval, and the benefits of the design did not outweigh the risks of that design.

88.     On information and belief, MEDTRONIC sells the Infuse® component separately from the LT-CAGE™ in order to illegally and improperly promote dangerous off-label uses of Infuse®.   MEDTRONIC does not disclose in its promotional or marketing campaign that Infuse® was approved for only one method of use in the lumbar spine.  As a result of concealing the approval, the FDA Panel's admonitions not to use it in a posterior approach because of the additional dangers and risks posed, and downplaying the adverse events associated with its use in this off-label manner by its Opinion Leaders in methods described, MEDTRONIC significantly increased the sale of the Product and reaped the benefits of its concealment and campaign of deceit.

89.     Infuse® has become a best seller for MEDTRONIC.  Sales of Infuse® were approximately $800 million for the 2011 fiscal year and the vast majority of these sales were attributable to off-label use of the product.  Off-label promotion results in off-label uses of Infuse®, which account for 85% to 90% of all spine surgeries involving Infuse®.

5)     **Medtronic's Fraud and Misrepresentations as to Infuse®**

90.     MEDTRONIC systematically manipulated the medical literature regarding Infuse® to misrepresent the product's safety and efficacy and to conceal

-24-

its financial ties to the studies' authors and its role in writing the articles.  From at least 2002 until the Spine Journal articles were published in the Summer of 2011, MEDTRONIC engaged in a ghostwriting program of the articles and study reports in order to suppress any information about the real risks and dangers posed by off-label posterior use of Infuse®.  The specific misrepresentations regarding the products' safety and efficacy, described in greater detail below, include (1) the concealment of adverse events, (2) the omission of related risks, including but not limited to dangerous bone overgrowth, and an over-emphasis on the problems posed by traditional bone graft procedures, such as autograft; (3) inadequate or no information about the dose response of patients, such that doctors were misled as to how much Bone protein to use and what amount of bone growth would result.

<strong>a)</strong>   <strong><u>Fraudulent, Ghost-Written 2004 Spine Journal Article by Dr. Haid, Dr. Burkus, Dr. Branch and Dr. Alexander</u></strong>

91.   One example of MEDTRONIC's misrepresentations regarding the safety and efficacy of off-label uses of Infuse® is found in a 2004 article published in *The Spine Journal*: Posterior lumbar interbody fusion using recombinant human bone morphogenetic protein type 2 with cylindrical interbody cages, authored by Regis W. Haid, MD, Charles L. Branch, Jr., MD, Joseph T. Alexander, MD, J. Kenneth Burkus, MD.  The Spine Journal 4 (2004) 527-539.

92.   This study revealed statistically significant variables concerning the radiographic presence of bone in the spinal canal and foramina in the group that received Infuse®.  However, the authors denied that intraspinal bone formation had any clinical implications.  *Id.* at 528.  By denying that the bone had clinical implications, the doctors and MEDTRONIC were concealing the real risk and danger posed by use of Infuse® in this manner.

93.   MEDTRONIC employees, including employees of its Marketing Department, were involved in ghost-writing this 2004 *Spine Journal* article, as well as peer-review correspondence in defense of the article prior to its publication.

Ex. C, Senate Finance Committee Report at 15-17.  MEDTRONIC employees edited the draft manuscript for the article to include comments supportive of the use of Infuse® in an off-label posterior approach.  These edits were ultimately included in the published article.  In addition, MEDTRONIC employees covertly participated in the peer-review process by drafting at least part of a letter on behalf of Dr. Burkus and the other physician authors named on the paper, responding to peer-reviewer criticism and allegations of bias.  The response letter never disclosed MEDTRONIC's direct role in editing the article or the fact of MEDTRONIC's payments to each of the physician authors.  In particular, by the end of 2003, Dr. Haid, Dr. Burkus and Dr. Alexander received $7,793,000, $722,000 and $826,655 respectively from MEDTRONIC.  *Id.* at 5, 17.  Dr. Haid, Dr. Burkus and Dr. Alexander received these funds to create research, leading to publications and presentations, that would promote the use of Infuse®, in particular off-label uses of the product.

b)   **Fraudulent, Ghost-Written 2005 *Journal of Bone and Joint Surgery (JBJS)* Article by Dr. Burkus, et al.**

94.   Indeed, MEDTRONIC employees were substantively involved in production eleven journal articles authored by the company's paid physician consultants, including several that specifically addressed the off-label use of Infuse® in posterior approach surgeries, like the surgery that Plaintiff underwent.  Ex. C, Senate Finance Committee Report, at 6-7.  In addition to the instance of ghost-writing in the 2004 *Spine Journal* article described above, a MEDTRONIC employee. Dr. Julie Bearcroft, directed the omission of a complete accounting of adverse event data regarding the use of Infuse® from a 2005 *Journal of Bone and Joint Surgery (JBJS)* article by Burkus, et al.  *Id.* at 9 (describing Bearcroft's "significant changes" to Dr. Burkus's article, including changes in content, and the omission of a table of adverse events in the published paper, following her email

1    correspondence recommending omission of "significant detail" concerning adverse

2    event data).

3         **c)     Medtronic's Employees and Agents, including its Opinion
              Leaders, Repeated their Fraudulent and Misleading Statements in
4             Presentations and Discussions with Physicians Nationwide**

5         95.     Plaintiff is informed and believes that the misrepresentations and

6    intentional omissions of risks and adverse effects that are described above have also

7    been made at presentations and conferences where the off-label uses of Infuse® in

8    spinal surgeries have been promoted by physicians hired by MEDTRONIC to make

9    presentations to other doctors at medical meetings and conferences.  These

10   presentations were intended by MEDTRONIC to be cloaked in proper science and

11   appear to be presentations about reputable science and research, when, in fact, as

12   described they were tailored and ghostwritten by the Company in order to hide the

13   truth about Infuse® and push the sales of Infuse®.  These physicians either wittingly

14   or not became pawns of MEDTRONIC in hawking the sale of this Product in a

15   manner unapproved by the FDA.

16        96.     Following the limited FDA approval of Infuse® in 2002, Medtronic

17   published a "Fact Sheet".  The Fact Sheet represented, in part, the following:

18   **Fact Sheet**

19   ***INFUSE® Bone Graft/LT-CAGE®*** Lumbar Tapered Fusion Device… Spinal
     fusion surgery with INFUSE® Bone Graft and the LT-CAGE® Device **is**
20   **essentially the same as traditional autograft procedures,** without the need for
     the additional surgery to harvest bone from the patient's hip. **Scientists**
21   **determined** that rhBMP-2, with an absorbable collagen sponge as the carrier,
     (INFUSE® Bone Graft) **is an effective replacement for autograft bone in spinal**
22   **fusion surgery**. This conclusion is **based on data resulting from a large-scale,**
     **multi-center, prospective, randomized, two-year study** involving 279
23   degenerative disc disease patients implanted with INFUSE® Bone Graft and the
     LT-CAGE® Lumbar Tapered Fusion Device. The **study assessed the safety,**
24   **efficacy** and therapeutic benefits of the new procedure as compared to traditional
     autograft procedures… The data showed that the study met all of its primary
25   endpoints… Long-term cost offsets (within two years of surgery): **Significantly**
     **fewer complication**s that would require follow-up visits…[3]
26

27

28
     ───────────────────────
     [3] Medtronic, Fact Sheet (2002) *available at*

AMENDED COMPLAINT FOR DAMAGES
                                                         CASE NO. 13-01679

97.     In the "Fact Sheet" Medtronic made representations that Infuse® is essentially the same autograft procedures. Medtronic stated that "Scientists determined…" without mentioning the fact that these "scientists" were extremely highly compensated by Medtronic to the tune of millions and in some cases, tens of millions of dollars.

98.     In the "Fact Sheet" Medtronic states that "The **study assessed the safety, efficacy** and therapeutic benefits of the new procedure as compared to traditional autograft procedures… The data showed that the study met all of its primary endpoints… Long-term cost offsets (within two years of surgery): **Significantly fewer complication**s that would require follow-up visits…[4]".

99.     However, nowhere does Medtronic state that Medtronic employees significantly altered the printed/reported results of those "studies" to reflect better outcomes for Infuse® and worse outcomes for the alternative procedures, than what was actually observed.

100.    In the Fact Sheet, Medtronic did not simply provide the studies, but rather Medtronic wrote opinions and summaries of the studies for their own promotional purposes.[5]

_____

*http://www.medtronic.com/downloadablefiles/InFuse - InFuse Therapy Fact Sheet.pdf.*

[4] *Id.*

[5] Congress created a very limited "safe harbor" for certain "off-label" promotion between 1997 and 2006. The "safe harbor" allowed manufacturers to provide copies of peer reviewed scientific articles to physicians. See 21 U.S.C. § 360aaa, 360aaa-1 (these statutes had a sunset clause of September 30, 2006 and were never renewed, see 21 C.F.R. §§ 99.101 (current FDA regulations on this issue). As further discussed herein, Plaintiffs, however, allege that Medtronic's "off-label" promotional efforts far exceeded these "safe harbor" activities (i.e. redistribution of peer reviewed articles) and included other impermissible acts, including but not limited to, using paid consultants, key opinion leaders, seminars, presentations, as well as drafting, editing and ghost writing the so-called "peer reviewed articles" while paying the listed "authors" (who are acting as agents for the company) millions of dollars without disclosing these efforts or payments within the contents of the articles or anywhere publically, all to actively and consciously over promote the "off-label" uses of Infuse®.

101. As alleged in detail herein these "scientific studies" were knowingly false and misleading. Medtronic manipulated the scientific data as well as the so-called peer reviewed literature that was written by Medtronic's secret agents who were compensated hundreds of millions of dollars. Medtronic went so far as to improperly ghost write and edit these studies and literature before publication.

102. The falsity of Medtronic's representations contained in the Fact Sheet has been independently confirmed to be false by the Medtronic funded YODA study as discussed in detail further herein.

    d)    **The Widespread Repudiation of Medtronic-Funded Studies that Touted the Safety and Efficacy of Infuse®**

103. MEDTRONIC's misrepresentations in the 2004 *Spine Journal* article and 2005 *Journal of Bone and Joint Surgery (JBJS)* article concerning the risks associated with Infuse® are part of a larger pattern of fraudulent concealment by Medtronic concerning adverse events related to use of the product in spinal surgeries. MEDTRONIC's fraudulent statements regarding the safety and efficacy of Infuse® have been rejected by

    ii)    **June 2011 Special Edition of *The Spine Journal***

104. The June 2011 edition of *The Spine Journal* published a series of articles describing MEDTRONIC's failure to report accurately the side effects from its clinical trials, the statements by authors, paid by MEDTRONIC, downplaying the risks associated with Infuse® and over-emphasizing problems associated with traditional non-Infuse® bone graft products used in spine fusion procedures, and MEDTRONIC's failure to report that many of the authors who studied and promoted Infuse® had significant financial ties to MEDTRONIC with a median range of $12 to $16 million per study. The industry-sponsored articles omitted mention of indications from the earliest trials of inflammatory reactions, adverse back and leg pain events, radiculitis, retrograde ejaculation, urinary retention, bone

1    resorption, and implant displacement.  They also omitted mention of sterility and

2    cancer risks associated with rhBMP-2, as reported in FDA documents and hearings.

3         105.    An analysis led by Dr. Eugene Carragee at Stanford University, and

4    published in the June 2011 edition of *The Spine Journal*, identified thirteen Infuse®

5    studies sponsored by MEDTRONIC which reported no adverse events associated

6    with the product.  Eugene J. Carragee, Eric L. Hurwitz & Bradley K. Weiner, *A*

7    *Critical Review Of Recombinant Human Bone Morphogenetic Protein-2 Trials In*

8    *Spinal Surgery: Emerging Safety Concerns And Lessons Learned*, the Spine Journal

9    11, 471-491 (2011).  The analysis by Dr. Carragee and his team includes a table

10   that identifies each of the thirteen articles and quotes the authors' comments

11   regarding Infuse® -related observed adverse events in study patients.  *Id.* at Table 1,

12   "Original industry-sponsored rhBMP-2 clinical studies and reported adverse event

13   rates because of rhBMP-2."

14

15   *E.J. Carragee et al. / The Spine Journal 11 (2011) 471–491*                    473

16   Table 1
     Original industry-sponsored rhBMP-2 clinical studies and reported adverse event rates because of rhBMP-2

| Authors | rhBMP-2 Placement | rhBMP-2, n | rhBMP-2 Adverse events (%). | Authors comment regarding rhBMP-2–related observed adverse events in study patients |
|---|---|---|---|---|
| Boden et al. [2] | Anterior interbody (LT-cage, lumbar, rhBMP-2) | 11 | 0 | "There were no adverse events related to the rhBMP-2 treatment" |
| Boden et al. [3] | Posterolateral (lumbar, ± instrumentation) | 20 | 0 | "There were no adverse effects directly related to the rhBMP-2…" |
| Burkus et al. [5] | Anterior interbody (LT-cage, lumbar, INFUSE) | 143* | 0 | "There were no unanticipated device-related adverse events…" |
| Burkus et al. [6] | Anterior interbody (bone dowel, lumbar, INFUSE) | [24]† | 0 | "There were no unanticipated adverse events related to the use of INFUSE Bone Graft." (2002) |
| Burkus et al. [39] | Anterior interbody (LT-cage, lumbar, INFUSE) | 79 | 0 | None reported (2005) |
| Burkus et al. [40] | Anterior interbody (LT-cage, lumbar, INFUSE) | 277 | 0 | None reported |
| Baskin et al. [7] | Anterior interbody (cervical, INFUSE) | 18 | 0 | "There were no device-related adverse events" |
| Haid et al. [8] | Posterior interbody fusion (lumbar, INFUSE) | 34 | 0 | "No unanticipated device-related adverse events occurred" |
| Boakye et al. [41] | Anterior interbody (cervical, INFUSE) | 24 | 0 | "Analysis of our results demonstrated the safety and efficacy of this combination of cervical spine fusion therapy…. a 100% fusion rate and nonsignificant morbidity". |
| Dimar et al. (2009) | Posterolateral (lumbar, INFUSE, pedicle screws) | 53 | 0 | None reported |
| Glassman et al. [42] | Posterolateral (lumbar, AMPLIFY, and pedicle screws) | [148]† | 0 | None reported |
| Dimar et al. [10] | Posterolateral (lumbar, AMPLIFY, and pedicle screws) | 239 | 0 | "No adverse event that was specifically attributed to the use of rhBMP-2 matrix in the study group was identified" |
| Dawson et al. [11] | Posterolateral (lumbar, INFUSE, and pedicle screws) | 25 | 0 | None reported |
| Total | All types | 780 | | 99% CI <0.5% adverse event rate |

rhBMP-2, recombinant human bone morphogenetic protein-2; CI, confidence interval.
* Report patients as in Burkus 2003, not included in total rhBMP-2 calculation.
† Possible subgroup of Dimar et al., 2009, not included in total rhBMP-2 calculation.
‡ These patient reported again in Burkus 2005.

17

18

19

20

21

22

23

24

25

26

27

28

AMENDED COMPLAINT FOR DAMAGES
                                                                                CASE NO. 13-01679

106.    Dr. Carragee's analysis further explained the falsity of these representations.  He observed:

> Given that 780 patients received rhBMP-2 in these industry sponsored publications and that not a single adverse event had been reported, the estimated risk of rhBMP-2 use could be calculated to be less than 0.5% with 99% certainty. That is, the reported risk of an adverse event with rhBMP 2, based on the industry-sponsored data, was less than one-fortieth the risk of a course of commonly used anti-inflammatory or antibiotic medications.

*Id.* at 472.

107.    Dr. Carragee's team, however, reviewed FDA documents and subsequent publications and found originally unpublished adverse events and internal inconsistencies.  *Id.* at 471.  Based on this review, Dr. Carragee suggested an estimate of adverse events associated with Infuse® in spinal fusion surgeries ranging from 10 percent to 50 percent depending on approach.  *Id.*

### i)    June 2013 Yale Study Confirms Lack of Scientific Integrity of Medtronic-Sponsored Studies of Infuse®

108.    Following the unprecedented findings by *The Spine Journal*, Medtronic under its new CEO, Omar Ishrak commissioned a subsequent review of the effectiveness of Infuse®.

109.    In August 2011, Medtronic provided a $2.5 million grant to Harlan Krumholz, M.D. to create the Yale University Open Data Access Project (YODA).[6] YODA's stated goal was to "increase transparency and enhance the public trust in industry-funded clinical trials by facilitating the independent assessment and dissemination of data relevant to the benefits and harms of drugs and devices."[7] Through YODA, Yale led independent and systematic reviews of the entire body of scientific evidence regarding the safety and effectiveness of Medtronic's recombinant bone morphogenetic protein-2 (rhBMP-2) product.

---

[6] Center for Outcomes Research & Evaluation (CORE), YODA Project, *available at* http://medicine.yale.edu/core/projects/yodap/index.aspx.
[7] *Id.*

110.   In a public response to the initiation of the YODA study, twenty-one (21) preeminent surgeons voiced their concern in the article A biologic without guidelines: the YODA project and the future of bone morphogenetic protient-2 research, published in The Spine Journal in October 2012.  The surgeons provided in part:

> [a]s a specialty, **it is painful to consider how early prudent reporting of even the most obvious and suspicious adverse events might well have prevented a decade of serious complications** related to the use of rhBMP-2.  In retrospect, we can see how false confidence in a reportedly perfect safety profile promoted a period of BMP-2 application in areas of greater and greater potential danger. . . And yet, given the legacy of questionable research and limitations in the primary body of rhBMP-2 data, there is a possibility that expectations of YODA have been exaggerated.[8]

111.   The article further noted that "clinical researchers cannot act as financially engaged business associates, and dispassionate investigators cannot be both credible authors and entrepreneurs in research involving human subjects…[m]any principal investigators in the Medtronic-sponsored trials had financial conflicts of unprecedented magnitude, the effect of which will be difficult to estimate, but nearly impossible to overestimate, in post hoc analyses."[9]

112.   Even Dr. Krumholz, the creator of YODA, expressed his concerns stating, "This sounds eerily familiar to many of the transgressions we've read about from the pharmaceutical industry…It paints a picture of a company very heavily involved in the science; marketing contaminating the science; and the medical profession and researchers being complicit."[10]

---

[8] Carragee EJ, *A biologic without guidelines: the YODA project and the future of bone morphogenetic protein-2 research,* 12 Spine J. 878, 877-80 (2012).

[9] *Id.* at 878-79

[10] John Fauber, *Medtronic Helped Write, Edit Positive 'Infuse' Spine Studies*, (Oct 25, 2012), *available at* http://www.medpagetoday.com/PainManagement/BackPain/35551.

AMENDED COMPLAINT FOR DAMAGES
CASE NO. 13-01679

113.    In hopes to quell concerns of further impropriety, two academic teams, Oregon Health and Science University and University of York, conducted an independent review, on behalf of YODA, with full access to all of Medtronic's clinical trials, post-marketing and safety data regarding rhBMP-2.[11]

114.    Oregon Health and Science University stated that "[t]he primary aims of this report are 1) to estimate the effectiveness and harms of rhBMP-2 in spinal fusion in a systematic review using the individual patent data (IPD) when available, and 2) to assess reporting biases in published articles of industry-sponsored studies."[12]

115.    Oregon Health and Science University released their findings in June of 2013 and found that "there was serious selective reporting and underreporting of adverse events in the published articles for both rhBMP-2 and ICBG groups, especially in the Medtronic trials published early.  The actual rates of adverse events were much higher than reported."[13]

116.    More specifically the Oregon Health and Science University, reported that the IPD data contained "315 adverse events in the rhBMP-2 group and 274 adverse events in the autograft group two years after surgery."[14]  These finding are in direct contrast with the Medtronic-sponsored studies, which simply reported

---

[11] rhBMP-2 Project, Center for Outcomes Research & Evaluation (CORE), YODA Project, *available at* http://medicine.yale.edu/core/projects/yodap/rhbmp/overview.aspx.

[12] Rongwei Fu et al., *Effectiveness and Harms of Recombinant Human Bone Morphogenic Protein-2 (rhBMP-2) in Spine Fusion: A Systematic Review and Meta-analysis, Executive Summary*, Oregon Health & Science University, 1 (2013), *available at* http://medicine.yale.edu/core/projects/yodap/rhbmp/463_158786_OHSU rhBMP-2 Final Report.pdf.

[13] *Id.* at 9.

[14] *Id.*

AMENDED COMPLAINT FOR DAMAGES
CASE NO. 13-01679

either "no unanticipated device-related adverse events" or "no adverse events directly or attributable to rhBMP-2."[15]

117.     Dr. Rongwei Fu, the lead author of the Oregon Health and Science University study, stated **"[w]e found a lot of reporting bias** in [Medtronic's] published papers that tends to overstate the benefits and played down the risks." Further, Dr. Fu said "**it was difficult to identify "clear indications" for using the product,** as Infuse® offered no additional benefits beyond the normal benefits of the spine surgery." [16]

118.     Following an independent review of Medtronic's data, Oregon Health and Science University study found that Infuse® had more adverse events and an increased risk associated with its use, when compared to the gold standard traditional ICBG.  Specifically, Infuse® resulted in:

a. a risk of cancer almost double that of ICBG;

b. retrograde ejaculation was 4.76 times more likely with Infuse® than with ICBG;

c. spinal instability was 2.79 times more likely to occur as a vertebral fracture in patients using Infuse® as opposed to ICBG;

d. heterotopic bone growth was 5.57 times more likely to occur in PLIF and TLIF spinal fusions using Infuse® as opposed to ICBG;

e. osteolysis or bone destruction was 4.26 times more likely to occur in a TLIF and 3.17 times more likely in a PLF using Infuse® than a spinal fusion using ICBG; and f.hardware failure was as high as 8.37 times more likely to occur using Infuse® than with ICBG.[17]

---

[15] Eugene J. Carragee, Alexander J. Ghanayem, Bradley K. Weiner, *A challenge to integrity in spine publications: years of living dangerously with the promotion of bone growth factors,* 11 Spine J. 480, 482-83, 463-468 (2011).

[16] Christopher Weaver, *Studies Fail to Back Medtronic Spine Product*, The Wall Street Journal, (June 17, 2013), *available at* http://online.wsj.com/article/SB10001424127887323836504578551801689098558.html.

[17] Rongwei Fu et al., *Effectiveness and Harms of Recombinant Human Bone Morphogenic Protein-2 (rhBMP-2) in Spine Fusion: A Systematic Review and Meta-analysis, Executive Summary*, Oregon Health & Science University, 5 (2013), *available at* http://medicine.yale.edu/core/projects/yodap/rhbmp/463_158786_OHSU rhBMP-2 Final Report.pdf.

119.   Furthermore, a meta analysis of the IPD showed that "there was moderate strength of evidence of **no consistent differences between rh-BMP-2 and ICBG in overall success of fusion**."[18] (Emphasis added).

120.   This finding directly contradicts the false and misleading marketing materials provided by Medtronic directly to physicians and consumers on their websites which touted a greater fusion rates with Infuse® when compared to ICBG.

121.   Similarly, University of York stated that the three objectives of their independent review of Medtronic's data were to "1) [e]xamine the potential benefits of rhBMP-2; 2) Examine the potential harms of rhBMP-2; and 3) Assess the reliability of the published evidence base."[19]

122.   University of York, in June of 2013, published results that were similar to those of Oregon Health and Science University.  Their review found:

a.   The use rhBMP-2 in spinal surgery had modest benefits when compared with ICBG surgery 24 months after surgery;[20]

b.   A near doubling in number of cancers with rhBMP-2;[21]

c.   Analyses of adverse event IPD from the Medtronic-sponsored trials showed some complications to be more common among rhBMP-2 patients…Arthritis, implant-related events, retrograde ejaculation, wound complications and neurological, urogenital and vascular events were also more common among rhBMP-2 patients; and finally

d.   University of York showed further concern stating, "[s]tudies published in the wider literature and post marketing data raise concerns about other adverse events not captured or easily apparent in the IPD provided, including heterotopic bone formation, osteolysis, retrograde ejaculation, urinary retention, and dysphagia.  Owing the non-randomised nature of the studies and difference between them, the

---

[18] *Id.* at 5.

[19] Jennifer V.E. Brown et al., Systemic review and meta-analysis of the safety and efficacy of recombinant human bone morphogenic protein-2 (rhBMP-2) for spinal fusion, Centre for Reviews and Dissemination University of York, 3 (2013), *available at* http://medicine.yale.edu/core/projects/yodap/rhbmp/463_158787_York rhBMP-2 Final Report.pdf.

[20] *Id.* at 16.

[21] *Id.* at 17.

AMENDED COMPLAINT FOR DAMAGES
CASE NO. 13-01679

strength of this body of evidence is weak and findings should be interpreted cautiously."

123.   University of York commented specifically on the reliability of Medtronic's published evidence stating, "we found adverse events to be incompletely and inadequately described in the trial publications."

124.   Additionally, "comparing the CSR categories against the adverse events described in published journal articles suggests that **adverse event reporting across the Medtronic publications is relatively sparse and inconsistent**."[22](Emphasis added).

125.   Further, University of York found that the **"[p]ublished papers provided far less information than was available** in the confidential CSRs (or in the supplied IPD).  The way in which the adverse data were presented in the literature was **highly inconsistent with and the rationale for presenting some adverse events and not others was rarely clear**.  Brief, vague statements in some publications that simply noted 'no unanticipated device-related adverse events' were inadequate and unhelpful.  In our view, such statements, without supporting evidence, should not be considered acceptable for publication."[23](Emphasis added).

126.   University of York stated further that **"[s]tudies published in the wider literature and post marketing data raise concerns** about other adverse events not captured or easily apparent in the IPD provided, including heterotopic bone formation, osteolysis, retrograde ejaculation, urinary retention, and dysphagia. Owing the non-randomised nature of the studies and difference between them, **the strength of this body of evidence is weak and findings should be interpreted cautiously**."[24]

---

[22] *Id.* at 100.

[23] *Id.* at 118.

[24] *Id.* at xvi.

127.    Other preeminent researchers and scientific journals also weighed in on the study results.  Dr. Krumholz of Yale commented on the study findings stating that "**[e]vidence suggests that some data are not missing at random.**"[25]

128.    An article addressing the YODA study appeared in the July 23, 2013 edition of *The Journal of the American Medical Association* ("JAMA").  JAMA is the most widely circulated medical journal in the world.  The title of the article accurately sums up the results: "Open Access to Data Closes the Book on Efficacy of Popular Bone-Graft Device."  The article reports that YODA revealed Infuse® as product "has no clinical advantage over the traditional bone grafting methods." It further reports that both independent Universities found similar results, quoting York University's lead author Mark C. Simmonds; "[w]e think although we had different approaches, we did come up with similar findings [as the Oregon team]." The article reports that "[c]linically, Simmonds could not recommend using rhBMP-2."   Finally, the Oregon Health and Science University study team noted "earlier release of all relevant data would have better-informed clinicians and patients making medical decisions."[26]  The *JAMA* article is further recognition by the leaders of the medical community that Infuse® was misrepresented by Medtronic and its sponsored authors.

  **e)**   **Impact of Medtronic's Fraud**

129.    Thus MEDTRONIC, while providing spine surgeons with MEDTRONIC-funded studies and published articles purporting to support the efficacy and safety of the off-label uses of Infuse®, simultaneously and systematically concealed adverse events and downplayed other non-MEDTRONIC-

---

[25] Eugene Carragee, *Response to Long-Awaited YODA Report on Controversial Spinal Fusion Products,* The Spine Journal.  (June 17, 2003), *available at* http://www.spine.org/Documents/Carragee_Statement_YODA_Reports_061713.pdf.

[26] Mike Mitka, MSJ, *Open Access to Data Closes the Book on Efficacy of Popular Bone-Graft Device,* 359-340, (July 24, 2013) JAMA.

AMENDED COMPLAINT FOR DAMAGES
CASE NO. 13-01679

1   funded studies and articles demonstrating serious and frequent adverse events

2   caused by the same off-label uses.

3       130.   Physicians, including Plaintiff's surgeon, Dr. Brian Perri, were misled

4   by this biased and manipulated medical literature regarding Infuse®.  Plaintiff was

5   misled indirectly by virtue of her reliance on her physicians', including Dr. Perri's,

6   understanding of the risk and benefits of using Infuse®.

7       131.   At all relevant times, MEDTRONIC knew, and/or had reason to know,

8   that its representations and suggestions to physicians that Infuse® was safe and

9   effective for use in off-label surgeries were materially false and misleading; and

10   that physicians like Dr. Perri would rely on these misrepresentations and omissions

11   in the treatment of their patients, including Plaintiff.

12       132.   MEDTRONIC's specific concealments and misrepresentations,

13   including its distortion of the data concerning the adverse effects of autograph, are

14   described in this complaint.  However, Plaintiff's investigation is ongoing and

15   MEDTRONIC has likely made numerous other misrepresentations

16   **6)**   **Medtronic Failed to Warn During Its Fraudulent Campaign to Sell**
**Infuse**®

17

18       133.   Plaintiff has three theories upon which they allege a claim based on

19   MEDTRONIC's failure to warn.  These theories and facts also bolster Plaintiff's

20   fraud claim.

21       134.   First, MEDTRONIC has failed to satisfy its duty to warn based on its

22   failure to report adverse events to the FDA.  This claim mirrors the claim approved

23   by the Ninth Circuit in *Stengel v. Medtronic*, 704 F.3d 1224 (9th Cir. 2013).

24       135.   The allegations supporting Plaintiff's first theory are as follows.  A

25   number of patients have reportedly been harmed in off-label uses of Infuse®.

26   Approximately 844 adverse events involving Infuse® in spinal surgeries have been

27   reported to the FDA from July 2, 2002 to August 31, 2011.

28

AMENDED COMPLAINT FOR DAMAGES
CASE NO. 13-01679

136.    However, as noted earlier, Dr. Carragee and his team discovered specific instances of unreported adverse events related to the use of Infuse® in spinal surgeries.  In addition, they estimated adverse events associated with the product ranging from 10 percent to 50 percent depending on the approach used in the spinal surgery.  Given the increase in the use of genetically modified bone growth protein in inpatient procedures between October 2002 and December 2007, from 23,900 to 103,194, and that spinal fusion surgeries accounted for 92.8 percent of these procedures, and given that the vast majority of these were off-label uses, Plaintiff is informed and believe that the adverse events are vastly under reported to the FDA by MEDTRONIC and have been for many years.

137.    Plaintiff is also aware of one instance in which MEDTRONIC failed to report the death of a patient resulting from the off-label use of Infuse® as required by FDA regulations and in direct violation of those regulations. By that failure, MEDTRONIC actively concealed the true risk and danger of the product, lulling doctors into believing that the risks posed by the product were not serious or life threatening.

138.    Plaintiff's second theory is that MEDTRONIC had a duty to warn based on nine years of mounting evidence, following the July 2002 PMA approval of Infuse®, that indicated foreseeable dangers facing patients subject to off-label uses of the product.  MEDTRONIC was aware of specific risks regarding Infuse®. Yet MEDTRONIC's agents and employees encouraged Opinion Leaders not to include a full accounting of such risks, including known adverse events, in their publications.  A surgeon in another case involving Infuse® has also testified that a MEDTRONIC representative told him that the risk of bone overgrown was not a cause for concern in his patient.  MEDTRONIC, based on existing studies, knew or should have known about the risks of bone overgrowth, radiculitis and other problems associated with Infuse®.

139.    However, instead of warning of such foreseeable risks, MEDTRONIC downplayed and minimized the risks in the medical literature that it manipulated through its paid Opinion Leaders and through misrepresentations made by its employees and agents.  As explained further, below, had Plaintiff's surgeon received warnings regarding such risks and a full disclosure of adverse events, he would have used Infuse® in the manner that he did.

140.    Plaintiff's third theory is that MEDTRONIC had a duty not to deceive. However MEDTRONIC engaged in a pattern and plan of deception intended to result in reliance by the implanting doctors and significantly increased sales and revenue.  That plan of deception was, as described above, that MEDTRONIC systematically manipulated the medical literature regarding Infuse® through ghostwriting and by paying Opinion Leaders create research touting the product and to write and give favorable publicity regarding Infuse® and, thus, misrepresent the product's safety and efficacy.

7)    **Off-Label Use of Infuse® is Dangerous and Causes Adverse Side Effects.**

141.    Off-label use of Infuse® was and remains particularly concerning due to the known adverse (and in at least one case deadly) side effects known to MEDTRONIC at the time of the product's original FDA approval in 2002.

142.    The off-label use of Infuse® in the spine frequently causes serious adverse events.

143.    The FDA Panel's initial fears in 2002 concerning the dangers of off-label use of this product were confirmed by subsequent medical studies that demonstrate that off-label use of Infuse® may present severe risks and dangers to patient safety.

144.    For example, an early study sponsored and funded by MEDTRONIC in 1999 demonstrated an approximately 70% rate of ectopic bone growth — meaning bone overgrowth where such growth is not desired.  Only a few months into this clinical trial of Infuse®, CT scans showed unwanted bone had formed in

AMENDED COMPLAINT FOR DAMAGES
CASE NO. 13-01679

the spinal canals of 70% of the patients treated with Infuse®. This clinical trial, intended to include hundreds of people with degenerative disc disease, was halted after only 34 patients were treated with Infuse®.

145.    A spine surgeon who participated in this PLIF with Infuse study reported that one of the patients he treated required two extra surgeries to clear the excessive bone growth from the patient's spinal canal.  The complications observed in this PLIF trial were particularly serious given the potential of neural impingement (or nerve pinching) from such bony overgrowth in that procedure, potentially triggering the very sort of pain that a fusion procedure attempts to eliminate.

146.    This bone overgrowth results from Infuse®'s very mechanism of action.  In such cases, Infuse® can stimulate bone growth where new bone is not desired and can lead to excessive bone growth into areas where bone should not be growing — *i.e.*, into or against the spinal cord or other spinal nerves.

147.    There is insufficient scientific evidence concerning the proper dosages of rhBMP-2 for use in the off-label procedures such as PLIF, TLIF, PLF and cervical fusions, or the expected responses to the protein in different biological environments.  Indeed, many adverse events associated with the use of Infuse® result from off-label use of the product by surgeons who do not fully understand the highly potent nature of this molecule.

148.    A study entitled, "Prevalence, Complications, and Hospital Charges Associated with Use of Bone-Morphogenetic Proteins in Spinal Fusion Procedures,"  Cahill, et al., *JAMA*, 2009 Jul 1;302(1):58-66, analyzed the integration of BMP into spinal surgeries since 2002, and the association between its use and postoperative complications, length of hospital stays, and hospital charges.  Significantly, the study determined that use of bone morphogenetic proteins is associated with a substantially higher rate of complications in anterior cervical fusion procedures, which has resulted in an approximate 41% increase in hospital

1  charges for these procedures. Notably, the study only considered complications that
2  occurred during postoperative inpatient hospitalization immediately following the
3  surgical procedure, and did "not include delayed complications in the outpatient
4  setting," such as hospital readmission-related complications.

5  149.    Such a shortcoming likely resulted in a significant understatement of
6  the extent of complications resulting from use of bone morphogenetic proteins
7  because, as an FDA Public Health Notification regarding complications from use of
8  BMP in the cervical spine indicated, "[m]ost complications occurred between 2 and
9  14 days post-operatively with only a few events occurring prior to day 2." Indeed,
10  acknowledging this fact, Dr. Kevin S. Cahill, who led the study, publicly
11  commented, "ours is probably a bottom estimate."

12  150.    Aside from potential understatement of complications, the study found
13  that the rate of complications in anterior cervical fusions was 51.4% higher when
14  using bone morphogenetic protein than in similar cases when bone morphogenetic
15  protein was not used. These complications included increased rates of voice and
16  swallowing-related problems, and swelling of the neck. The study's authors noted a
17  "significantly greater" rate of complications when using bone morphogenetic
18  proteins in these surgeries, even after considering and compensating for numerous
19  other variables that could affect complications rates, such as age, sex, etc.

20  151.    Astonishingly, it was not until 2004 that a paper about the disastrous
21  1999 PLIF trial by spine surgeons with financial ties to MEDTRONIC was finally
22  published in a medical journal.  This article inaccurately maintained that these
23  patients were not harmed by Infuse®.  The paper (Haid, et al., *Posterior lumbar*
24  *interbody fusion using recombinant human bone morphogenetic protein type 2 with*
25  *cylindrical interbody cages,  The Spine Journal*, 4(5):527-538, September 2004)
26  downplayed the bone overgrowth complications claiming that while it showed up
27  on CT scans, patients did not suffer ill effects.  This claim was false and misleading
28  and further encouraged dangerous off-label uses of Infuse.

AMENDED COMPLAINT FOR DAMAGES
CASE NO. 13-01679

152.    In fact, David Malone, M.D., a Tulsa, Oklahoma spine surgeon involved in this 1999 PLIF clinical trial with Infuse, told the *Milwaukee Journal Sentinel* that two of his patients had to undergo additional surgeries because the BMP-induced bone overgrowth was painfully impinging on their nerve roots.  One of the patients, a man who was in his 50s at the time, needed three operations - one for the implant, a second to remove the unwanted bone formation, and then a third when the additional bone grew back yet again.[27]

153.    "It was a pretty amazing biological response," Malone said in an interview.  "It grew back even larger than the first time.  It got to the point that secretaries in our clinic could look at X-rays and tell who got the BMP (Infuse) and who did not.  You could see that much bone growth."[28]

154.    A May 15, 2006 medical article in *Spine* entitled "Controlling Bone Morphogenetic Protein Diffusion and Bone Morphogenetic Protein-Stimulated Bone Growth Using Fibrin Glue" observed, "rhBMP-2 may stimulate bone growth in areas in which bone is not desired, especially as the material 'leaks' into such spaces. . . . Although this phenomenon has not been thoroughly studied, it implies that the release of rhBMP-2 into the soft tissues stimulates a rapid, potentially life-threatening, inflammatory reaction." [29]

155.    Again, in a November 2006 issue of *Spine*, several authors noted a significantly increased risk of swelling from off-label use of Infuse® in cervical spine fusions compared to traditional fusion surgeries. Of the 234 patients studied, 27.5% of those patients treated with Infuse® had significant swelling after the surgery, while only 3.6% of those patients not treated with Infuse® experienced

---

[27] *See, e.g.*, "Infuse® Cited in Patients' Painful Bone Overgrowth:  More Surgery Needed After Use, Surgeon Says," by John Fauber, *Milwaukee Journal Sentinel*, June 27, 2011.

[28] *Id.*

[29] Patel, et al, *Controlling Bone Morphogenetic Protein Diffusion and Bone Morphogenetic Protein-Stimulated Bone Growth Using Fibrin Glue, Spine,* 31(11): 1201-1206, May 2006.

such a complication. Further analysis demonstrated that "patients receiving rhBMP-2 were **10.1 times more likely** to have a swelling complication versus those who did not receive rhBMP-2." (Emphasis added.)[30]

156.    A *European Spine Journal* article in August 2007 found that use of Infuse® in certain cervical spine fusions resulted in a statistically significant increase in the number of complications, including dysphagia (difficulty in swallowing) and swelling in the neck area. The authors determined that "[d]ysphagia was a common complication and it was significantly more frequent and more severe in patients in whom rhBMP-2 was used. Post-operative swelling . . . was significantly larger in the rhBMP-2 group." Of the patients evaluated, 85% of those treated with Infuse® reported difficulty swallowing after the surgery; a complication that was far less severe in those not treated with Infuse®. Indeed, one patient required a feeding tube for six weeks after the surgery as a result of the complication.[31]

157.    On July 1, 2008, the FDA issued a Public Health Notification to healthcare practitioners entitled "Life-threatening Complications Associated with Recombinant Human Bone Morphogenetic Protein in Cervical Spine Fusion" (the "FDA Notification"), which strongly warned medical professionals who used Infuse® and other BMP products of serious complications that had occurred from the off-label use of these products in the cervical spine.[32]

---

[30] Smucker, et al., *Increased Swelling Complications Associated with Off-Label Usage of rhBMP-2 in the Anterior Cervical Spine, Spine,* 31(24): 2813-2819, November 2006.

[31] Vaidya, et al., *Complications of Anterior Cervical Discectomy and Fusion Using Recombinant Human Bone Morphogenetic Protein-2, European Spine Journal,* 16(8): 1257-1265, March 2007.

[32] FDA Public Health Notification: Life-threatening Complications Associated with Recombinant Human Bone Morphogenetic Protein in Cervical Spine Fusion, July 1, 2008, http://www.fda.gov/MedicalDevices/Safety/AlertsandNotices/PublicHealthNotifications/ucm062000.htm

158.     The FDA Notification stated that the agency had received numerous reports of complications from BMP use in the cervical spine that "were associated with swelling of neck and throat tissue, which resulted in compression of the airway and/or neurological structures in the neck. Some reports describe difficulty swallowing, breathing or speaking." The notification further stated that these complications had resulted in "the need for emergency medical intervention," which included "respiratory support with intubation, anti-inflammatory medication, tracheotomy and most commonly second surgeries to drain the surgical site." The FDA Notification concluded that "in light of the serious adverse events described above, FDA recommends that practitioners either use approved alternative treatments or consider enrolling as investigators in approved clinical studies."

159.     On September 4, 2008, *The Wall Street Journal* published a front-page article entitled "MEDTRONIC Product Linked to Surgery Problems."[33]  This article noted both the complications resulting from the use of Infuse® in the cervical spine already disclosed in the FDA Notification and additional complications resulting from other off-label applications of the product, stating:

> The FDA's alert about Infuse® was specific to neck surgeries. But a review of FDA records and medical literature shows there have been scores of other cases in which serious complications arose after the product was used in other off-label situations. Many of these cases involve unwanted bone growth near nerves or in areas outside targeted fusion sites. That can lead to pain, repeat surgeries and, in some cases, emergency intervention.

The article further stated that at least three-quarters, or 75%, of the adverse events reported to the FDA involved off-label use of Infuse®. Of course, this news had serious implications for MEDTRONIC because off-label use of Infuse® accounted for the majority of all Infuse® sales.

---

[33] "Medtronic Product Linked to Surgery Problems," by David Armstrong and Thomas M. Burton, *Wall Street Journal*, September 4, 2008.

160.   A September 2008 article in *The Spine Journal* also observed that the use of Infuse® in the cervical spine "has been associated with reports of serious adverse events.[34] Postoperative hematoma formation [a collection of blood outside the blood vessels, generally manifesting as bruises], prevertebral soft tissue swelling, [and] swallowing difficulty . . . are a few examples." Of the complications observed in this patient study group, 17% occurred in patients treated with traditional techniques, while 83% occurred in patients treated off-label with Infuse®. The authors concluded that the "cervical spine has proven much less forgiving with the institution of rhBMP-2 use. Complications induced by . . . rhBMP-2 were clearly evident in our review."

161.   On November 18, 2008, in connection with reporting MEDTRONIC's financial results for its 2009 second quarter (ended October 24, 2008), MEDTRONIC reported that revenue from its Spinal segment had, in fact, declined to $829 million for the quarter – down $30 million from the previous quarter. The decreased sales in the Spinal segment, clearly stemming from a significant decline in Infuse® sales, were a sharp deviation from MEDTRONIC's reports of repeated, double-digit, growth in the Spinal segment in previous quarters. Moreover, MEDTRONIC disclosed, for the first time, that it "recently received a subpoena from the Department of Justice looking into off-label use of Infuse®."

162.   Thereafter, MEDTRONIC continued to report lower sales of Infuse®, which it admittedly linked to a public health notice from the FDA regarding off-label use of recombinant human bone morphogenetic protein in the cervical spine that was issued in July 2008, a previously disclosed government investigation, negative newspaper stories, and a whistleblower lawsuit filed by two former MEDTRONIC employees against MEDTRONIC and a number of spine surgeons and distributors of the Infuse® bone graft.

---

[34] Jarosz, et al., *Complications of BMP Use in Cervical Spine Surgery, The Spine Journal,* 8(5): 23S-24S, September 2008.

163.    The use of Infuse® in off-label procedures was further scrutinized in a study published in the July 1, 2009 issue of JAMA that documented the health risks associated with off-label use of Infuse® and, contrary to previous studies conducted by MEDTRONIC-funded physicians, cast doubt on the cost-effectiveness of the product.[35]

164.    At least 1,200 reports of adverse events involving Infuse® have been made to the FDA from 2002 to 2011.  In 2011, for example, 278 Infuse-related adverse events were reported; in 2010, 362 adverse events were reported; and in 2009, 244 adverse events were reported.  The vast majority of these adverse event reports involve off-label use of Infuse®.

165.    In fact, in a 2012 article published in The Spine Journal, FDA researcher Emily Woo, M.P.H. concluded on-label use of Infuse accounts for only a tiny percentage (0.5%) of adverse events.  Off-label use of Infuse accounts for 99.5% of adverse events.[36]

166.    The number of Infuse-related adverse events is growing steadily over the years, and the proportion of off-label adverse events grows, as well, as a direct result of the MEDTRONIC Defendants' long-standing campaign of improper off-label promotion of the more dangerous off-label uses of Infuse which were never approved by the FDA.  The extent of these adverse events was, at all relevant times, hidden or downplayed by MEDTRONIC and its paid consultants.

**8)   MEDTRONIC's Prior Knowledge and Concealment of the Dangers of Off-Label Infuse® Uses.**

167.    Even at the time of FDA approval, MEDTRONIC and its senior management and its paid consultant "opinion leaders," were well aware of the

---

[35] Cahill, et al., *Prevalence, Complications, and Hospital Charges Associated with Use of Bone-Morphogenetic Proteins in Spinal Fusion Procedures, JAMA,* 302(1): 58-66, July 2009.

[36] Emily Jane Woo, *Recombinant Human Bone Morphogenetic Protein 2: Adverse Events Reported to the Manufacturer and User Facility Device Experience Database, The Spine Journal,* 12(10): 894-899, October 2012.

AMENDED COMPLAINT FOR DAMAGES
CASE NO. 13-01679

1  concerns regarding off-label uses of Infuse® and the serious dangers to patients

2  posed by those off-label uses.

3       168.   Notwithstanding the original FDA Panel's well-founded concerns

4  regarding off-label use, as well as the medical literature's corroboration of the

5  same, both of which MEDTRONIC had knowledge, MEDTRONIC intentionally,

6  negligently and recklessly concealed these dangers from the general public,

7  including the Plaintiff and Plaintiff's physicians.

8       169.   MEDTRONIC had actual knowledge of the Advisory Committee's

9  concerns regarding off-label use of the product and the dangers posed by off-label

10 use. Indeed, Defendants were on actual notice at this time of the Advisory

11 Committee's warnings that MEDTRONIC should guard against off-label uses of

12 this potent genetically-engineered liquid bone protein. Thus, even *prior* to FDA

13 approval, Defendants were on actual notice of the dangers that off-label use of

14 Infuse® posed to patients, such as the Plaintiff.

15      170.   Further, as described immediately *infra*, the MEDTRONIC-funded

16 studies on Infuse® from 1999 to until at least 2007 failed to accurately describe the

17 adverse effects that were observed in the earliest trials of Infuse®, such as severe

18 uncontrolled or ectopic bone growth, severe inflammatory reactions, adverse back

19 and leg pain events, radiculitis, retrograde ejaculation in men, urinary retention,

20 bone resorption, and implant displacement.  These MEDTRONIC-funded articles

21 also omitted any mention of the risks of sterility and cancer associated with

22 rhBMP-2 use, as reported in FDA documents and hearings.  MEDTRONIC

23 discouraged the publication of these results in the medical journal literature, thereby

24 hiding significant side effects from spine surgeons and patients.

25      171.   Further, Confidential Witness 2 ("CW 2") in a shareholder derivative

26 lawsuit filed against MEDTRONIC, more fully discussed *supra*, stated that

27 MEDTRONIC was aware of adverse events resulting from off-label use of Infuse®

28 in the cervical spine, including swallowing, and breathing problems.

172.     In response to these reports of adverse events, CW 2 stated that MEDTRONIC attempted to disseminate information to the medical community regarding what it considered to be the proper dose of Infuse® for this off-label application. MEDTRONIC also issued a "Safety Alert" letter to surgeons on September 14, 2004, informing them that MEDTRONIC had received reports of complications associated with off-label use of Infuse® in anterior cervical fusion procedures. MEDTRONIC wrote, "*[l]ocalized soft tissue edema has been reported in anterior cervical spine fusion surgery following the use of Infuse® Bone Graft…. Some reports were accompanied by patient complaints of swelling and difficulty in swallowing and breathing, three of which resulted in surgical intervention.*" (Emphasis added.)

173.     These adverse events were not isolated incidents, as described above. These adverse event reports from off-label uses of Infuse® indicate the very same complications as those noted in the studies discussed above, including, swelling, difficulty swallowing and breathing, excessive bone growth resulting in dangerous and painful spinal nerve compression and corresponding injuries, etc., and often require emergency medical intervention or a second surgery.

174.     For example, a December 12, 2005 report indicates that four or five days after an off-label PLIF procedure using Infuse®, the patient's swelling became so severe that surgical intervention was required. These are only a few examples of the hundreds of similar reports of serious complications related to off-label uses of Infuse® found on the MAUDE Database.

175.     A November 3, 2006 report indicates that a patient reported neck swelling, difficulty swallowing and possible shortness of breath two to three days after a cervical spine fusion using Infuse®. As a result, this patient had to undergo another surgery four days after the initial fusion.

176.     A July 21, 2008 report indicates that a patient developed massive neck swelling, very thick tracheal and bronchial secretions, and required a

1    tracheostomy—a procedure in which an incision is made in the neck and a tube
2    inserted to allow the patient to breathe—following a cervical fusion procedure with
3    Infuse®.

4           177.    Through MEDTRONIC's monitoring procedures—which include
5    written procedures for complaints, corrective and preventative actions and adverse
6    event reporting—all complaints and adverse events are documented, tracked, and
7    trended (or should be) in a database.  MEDTRONIC is required by federal
8    regulation to "establish and maintain" such an adverse event database.  *See* 21
9    C.F.R. § 803.1(a).  In addition, a report from a June 2006 FDA inspection of a
10   MEDTRONIC facility at 1800 Pyramid Place in Memphis, Tennessee, revealed that
11   MEDTRONIC had initiated a Preventative Action, dated April 21, 2006, and was
12   "studding [sic] the reason for an increase in the number of reported fluid collection,
13   hematoma, and seroma complaints since 4/2005." According to the report, the
14   "study indicated that sales for the Infuse® Bone Graph [sic] have increased and
15   more graphs [sic] are being implanted," and that the "study is still open."

16          178.    According to Confidential Witness #15 ("CW 15") in the *Minneapolis*
17   *Firefighters* lawsuit filed against MEDTRONIC, more fully discussed *supra*, a
18   Senior Vice President who worked at MEDTRONIC for numerous years until 2006
19   and a "Quality Group" at MEDTRONIC's Spine division were responsible for
20   addressing adverse events. According to CW 15, former COO Michael DeMane,
21   former President of MEDTRONIC Spinal and Biologics Mr. Wehrly, and former
22   Worldwide Vice President and General Manager, Biologics, Jon Serbousek, were
23   all aware of the adverse events related to Infuse®.  As a part of his employment with
24   Defendants, CW 15 discussed the complaints related to Infuse® at meetings with
25   these individuals and members of the Quality Group to decide whether or not
26   certain adverse events should be reported to the FDA.  Moreover, MEDTRONIC's
27   Spinal division used the very same complaint/adverse event reporting system as
28   MEDTRONIC corporate, which provided MEDTRONIC's executive officers

1    access to a database containing details of every complaint/adverse event

2    MEDTRONIC received relating to Infuse®.

3         179.    MEDTRONIC was further clearly aware of its settlement with the

4    Department of Justice ("DOJ") and entry into a Corporate Integrity Agreement,

5    discussed *supra*, in July of 2006. As a result, MEDTRONIC had actual knowledge

6    of the heightened risks to spine patients associated with MEDTRONIC's illegal,

7    improper, and unethical promotion of off-label use of Infuse® by MEDTRONIC's

8    Spinal or Biologics Divisions.

9    **9)**    **Off-label Promotion of Infuse® Significantly Impacted the Market**

10        180.    Off-label use of Infuse® increased year-after-year from the time of its

11   original limited use approval by the FDA in 2002, to the point where off-label use

12   of Infuse® Bone Graft accounted for an astounding 85% to 90% of all Infuse sales.

13        181.    Although undisclosed by MEDTRONIC, the first-hand accounts of its

14   former employees demonstrate that this extraordinarily high off-label use was

15   driven by MEDTRONIC's sales force. Specifically, MEDTRONIC's marketing and

16   sales employees directed spine surgeons to MEDTRONIC-compensated consultants

17   or "Opinion Leaders" or "Thought Leaders" – other spine surgeons paid by

18   enormous sums of money by MEDTRONIC – the sole purpose of which was to

19   promote off-label uses of Infuse®.  Through these and other illegal and improper

20   practices, MEDTRONIC was able to increase Infuse® sales year after year while

21   continuing to hide and downplay  the product's dangerous side effects when used

22   off-label in the spine.

23        182.    Several spine surgeons have already testified under oath at depositions

24   that MEDTRONIC sales personnel overtly and directly promoted to them the off-

25   label uses of Infuse in the spine, and Plaintiff is thus informed and believes that

26   MEDTRONIC engaged in a scheme at all relevant times to expand its market share

27   of this product by improperly encouraging such off-label uses.

28

183.    In this particular case, MEDTRONIC actively promoted the off-label procedures to Plaintiff's spine surgeon, and Plaintiff's spine surgeon would not have performed the off-label Infuse procedure in the absence of such promotion. MEDTRONIC's off-label promotion of Infuse to Plaintiff's surgeon was false and misleading, in that it overemphasized the purported benefits of the off-label use, and hid, minimized, or downplayed the true risks and dangers of the off-label use, all of which were known to MEDTRONIC at all relevant times.

**10)    MEDTRONIC's Off-Label Promotion Practices Have Led to Whistleblower and Shareholder Litigation and Federal Investigations**

184.    MEDTRONIC's unlawful off-label promotion campaign has been so extensive that it caught the attention of, among others, the FDA, the United States DOJ, Congress, the United States Army, several major universities, multiple medical journals, numerous major newspapers, independent physicians, and investors.

185.    Moreover, MEDTRONIC's unlawful off-label campaign has resulted in, among other actions, two whistleblower lawsuits (resulting in a multi-million dollar settlement with the DOJ, which included a Corporate Integrity Agreement), a shareholder derivative lawsuit that was recently settled for $85 million, several adverse regulatory actions by the FDA, and a congressional investigation (led by the United States Senate Committee on Finance).

**a)    Whistleblower Lawsuits Resulting in a Corporate Integrity Agreement**

186.    MEDTRONIC Defendants were named as defendants in two *qui tam* actions, *United States ex rel. (UNDER SEAL) v. MEDTRONIC. Inc., et al.*, Civil Action No. 02-2709 (W. D. Tenn. 2002) (hereinafter "*[Under Seal]*"), and *United States ex rel. Poteet v. MEDTRONIC, Inc., et al.*, Civil Action No. 03-2979 (W. D. Tenn. 2003) (hereinafter "*Poteet I*"), (collectively the "qui tam lawsuits"), both of which alleged that MEDTRONIC violated the False Claims Act, 31 U.S.C. § 3729,

1    *et seq.*, by paying illegal kickbacks to physicians in connection with promoting the

2    off-label use of Infuse® in the spine, which resulted in the submission of false or

3    fraudulent claims to federal health care programs.

4         187.   Based on its investigation, the DOJ contended that certain of the

5    payments, services, and remuneration mentioned above were improper and resulted

6    in the submission of false or fraudulent claims in violation of the Federal Anti-

7    Kickback Statute, 42 U.S.C. § 1320a-7b(b), *et seq.*, which prohibits individuals

8    from offering, soliciting or making any payment or remuneration to induce business

9    reimbursed under a federal or state health care program, and the False Claims Act,

10   31 U.S.C. § 3729, *et seq.*, which provides penalties for the submission of false

11   claims to the federal government. Both *[Under Seal]* and *Poteet I* were brought by

12   MEDTRONIC's former employees who made these allegations.

13        188.   In these lawsuits, the DOJ contended that between January 1, 1998 and

14   April 30, 2003, MEDTRONIC made payments and provided other remuneration to

15   a number of physicians and entities in connection with its spinal products in the

16   form of (1) payments and other remuneration for physicians' attendance and

17   expenses at medical education events, "think tanks," VIP/opinion leader events, and

18   meetings at resort locations; (2) services and payments for services to physicians

19   through MEDTRONIC's Healthcare Economic Services and eBusiness

20   Departments; and (3) payments made pursuant to consulting, royalty, fellowship

21   and research agreements with various physicians and entities

22        189.   Specifically, *[Under Seal]* was brought by a former MEDTRONIC in-

23   house counsel, who alleged that MEDTRONIC's "aggressive and illegal" sales and

24   marketing efforts were intended by MEDTRONIC to improperly induce physicians

25   to use MEDTRONIC's Spinal products, including Infuse®. The conduct alleged

26   included, *inter alia*: (1) lucrative consulting and royalty agreements with physicians

27   that used MEDTRONIC Spinal products, "the true purpose [of which were] to

28   funnel money to the physicians so that they will be induced to use [MEDTRONIC

1    Spinal] products;" and (2) "[l]avish all-expense paid trips to fine resorts . . .

2    disguised as Medical Education seminars, think tanks, or discussion groups . . . held

3    in places such as Hawaii, Cancun, Alaska, Beaver Creek, Whistler, Malaysia,

4    Amelia Island, Teton Valley, and New Orleans at Mardi Gras . . . [t]he purpose of

5    these lavish trips was to induce the physicians to use [MEDTRONIC Spinal]

6    products."

7         190.   The complaint further alleged that: "Most of the illegal kickback

8    practices described herein were begun by Sofamor Danek and continued by

9    [MEDTRONIC] after the acquisition. Kickbacks were the culture and way of doing

10   business at Sofamor Danek and the company was determined to continue that

11   culture, and did continue that culture, when Sofamor Danek became part of the

12   MEDTRONIC empire."

13        191.   *Poteet I* brought by a former MEDTRONIC employee who was tasked

14   by MEDTRONIC to arrange travel (including expense reimbursement) for

15   numerous spinal surgeons to attend MEDTRONIC-sponsored events and other

16   professional meetings.  This former employee also alleged that MEDTRONIC paid

17   surgeons substantial fees—sometimes up to hundreds of thousands of dollars per

18   year—for consulting services that were grossly in excess of their fair market value,

19   entered into royalty agreements that were designed to disguise illegal remuneration,

20   and provided physicians opportunities for lavish travel and recreational activities,

21   including "upgraded lodging for physicians, dinners, entertainment and activities

22   such as golf, snorkeling, sailing, fishing, shopping trips, [and] horse-back riding"

23   for using MEDTRONIC products. These consulting agreements and other payments

24   were illegitimate means of inducing physicians to use MEDTRONIC products and

25   to recommend to other physicians that they do the same.

26        192.   On July 18, 2006, MEDTRONIC agreed to pay $40 million to the

27   United States of America to settle these lawsuits under the False Claims Act, 31

28

1    U.S.C. §§ 3729-3733, the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a, and

2    the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-12.

3         193.   As part of the DOJ settlement, MEDTRONIC agreed to enter into a

4    five-year Corporate Integrity Agreement ("CIA") with the Office of the Inspector

5    General/Health and Human Services that, as MEDTRONIC described in its July 18,

6    2006 press release, implemented substantial oversight structures and procedures

7    meant to ensure "top-level attention to corporate compliance measures." Among

8    other things, the CIA required MEDTRONIC to establish an electronic database to

9    capture and manage all non-sales related transactions between MEDTRONIC's

10   Spinal segment and its physicians or customers, with all such transactions subject to

11   an established set of internal controls and review processes, including monitoring

12   by MEDTRONIC senior management and MEDTRONIC's Chief Compliance

13   Officer.

14        194.   Moreover, the CIA required MEDTRONIC to implement internal

15   policies and procedures to ensure stricter regulatory compliance, which obligated

16   MEDTRONIC to institute a number of changes to improve oversight of its Spinal

17   division.

18        195.   Significantly, the CIA required MEDTRONIC to adopt procedures to

19   ensure that any "arrangements"—a term intended to cover physician consulting

20   agreements and broadly defined as engagements involving "directly or indirectly,

21   the offer, payment, solicitation, or receipt of anything of value; [] between

22   [MEDTRONIC] and any actual or potential source of health care business [e.g.,

23   physicians]"—would not violate federal law. Such procedures were to include,

24   among other things: (1) creating a database of all existing and new or renewed

25   arrangements; (2) tracking remuneration from MEDTRONIC to all other parties to

26   such arrangements; (3) tracking service and activity logs to ensure that parties to an

27   arrangement are performing their duties under the applicable arrangement; (4)

28   implementing procedures that ensure all arrangements are reviewed for adherence

1    to the Anti-Kickback Statute; and (5) regular (at least quarterly) review by the

2    MEDTRONIC Compliance Officer of the arrangements database along with

3    reporting (at least quarterly) to the MEDTRONIC Compliance Committee.

4          196.    The CIA and the previous whistleblower litigation placed

5    MEDTRONIC and its agents on actual notice that its practice of marketing, and

6    promoting Infuse® for off-label uses was improper and required wholesale change

7    to avoid further adverse regulatory action or other liability.

8          197.    As a result of this settlement, MEDTRONIC agreed to negotiate with

9    representatives of the National Association of Medicaid Fraud Control Units to

10   reach an agreement that provides for distribution of certain sums to the several

11   states with which MEDTRONIC agreed to a settlement concerning the conduct at

12   issue in the False Claims lawsuits.

13         198.    Nonetheless, MEDTRONIC's unlawful practices continued, as did

14   MEDTRONIC's aggressive efforts to drive Infuse® sales by promoting off-label

15   applications, such as precisely those used on the Plaintiff.  MEDTRONIC has

16   continued to improperly and illegally promote the off-label use of Infuse® for non-

17   FDA-approved uses of the product.  Indeed, it was motivated to do so knowing that,

18   absent off-label use, sales of Infuse® would dramatically decline.  In order to

19   prevent a decline in sales revenue, MEDTRONIC continued to covertly employ the

20   same lucrative "consulting" arrangements and other unlawful conduct to promote

21   off-label uses of Infuse®.

22         199.    As a result of MEDTRONIC's undisclosed misconduct, the percentage

23   of off-label Infuse® usage increased over time, including after the DOJ settlement

24   on July 14, 2006.  By 2011, off-label use of Infuse constituted more than 90% of

25   the total use of Infuse® in spinal fusion procedures.

26         200.    Indeed, MEDTRONIC's unlawful marketing and promotion was so

27   effective that a MEDTRONIC analyst from Bernstein Research noted in a

28   November 21, 2006 report that analysts were "expecting *continued indication*

-56-                    AMENDED COMPLAINT FOR DAMAGES
                        CASE NO. 13-01679

1    *expansion (e.g., recent dental approval and likely approval for posterior lateral*

2    *fusion) for Infuse® to be the main driver for the spinal business* in the mid-term."

3    (Emphasis added.) What this analyst and the public at large did not know was that,

4    despite the limited FDA-approved applications of Infuse®, MEDTRONIC

5    continued to drive sales solely through off-label indications; and was doing so in

6    spite of the CIA, the material risk of further regulatory action or other liability, and

7    in conscious disregard for the health and welfare of spine patients such as the

8    Plaintiff.

9          **b)**     <u>**Shareholder Derivative Action Against Medtronic.**</u>

10

11        201.   A federal securities lawsuit filed on behalf of the Minneapolis

Firefighters' Relief Association against MEDTRONIC, *Minneapolis Firefighters'*

12    *Relief Assoc. vs. MEDTRONIC, Inc.*, Civil No. 08-6324 (PAM/AJB) (D.Minn.,

13    2009), also alleged evidence of MEDTRONIC's egregious campaign of off-label

14    promotion of Infuse®, even after the CIA.  MEDTRONIC's actions, described by

15    the "Confidential Witnesses" ("CW"), included:

16

17        a.    MEDTRONIC-sponsored physician meetings, during which

MEDTRONIC would employ paid consultants – typically surgeons hand selected

18    by MEDTRONIC – to present off-label presentations to local physicians. CW1,

19    Consolidated Class Action Complaint dated August 21, 2009, at ¶ 93.

20

21        b.    MEDTRONIC's instructions to its sales representatives

regarding various off-label uses of Infuse®, including how much of the biologic to

22    use with off-label cervical fusions, the purpose of which was to instruct physicians

23    regarding off- label uses. CW1, *Id.* at ¶ 94.

24

25        c.    MEDTRONIC's directions to its sales representatives that they

be present during off-label Infuse® surgeries "to assist and direct and give advice

26    when asked." CW1, *Id.* at ¶ 95; CW2, *Id.* at ¶ 97; CW5, *Id.* at ¶ 101; CW6, *Id.* at ¶

27    102.

28

AMENDED COMPLAINT FOR DAMAGES
CASE NO. 13-01679

1         d.     MEDTRONIC's creation of sales quotas that were described by

2    the CWs as impossible to reach without pushing off-label use. CW1, *Id.* at ¶ 95;

3    CW9, *Id.* at ¶ 105; CW11, *Id.* at ¶ 107; CW12, *Id.* at ¶ 108.

4         e.     MEDTRONIC sales representatives' references to data from

5    published literature (presumably funded by MEDTRONIC) when questioned by

6    surgeons, the purpose of which was to provide surgeons with information regarding

7    proffered techniques for off-label procedures and to educate them regarding off-

8    label uses. CW2, *Id.* at ¶ 96.

9         f.     MEDTRONIC's development of smaller-sized Bone Graft kits

10   under the guise of selling them for FDA-approved uses, when, in actuality,

11   MEDTRONIC had designed them to be used in off-label cervical fusion surgeries.

12   CW2, *Id.* at ¶ 97; CW7, *Id.* at ¶ 103.

13        g.     Moreover, by comparing the number of units of rhBMP-2 with

14   the sales of the LT-Cage™ component – which were packaged and sold separately

15   – CW2, 11, and 12 determined that the driving force behind MEDTRONICs $750

16   million in sales of Infuse® was solely attributable to off-label uses. Although the

17   FDA required the rhBMP-2 and LT-Cage™ to be used together, sales of the

18   rhBMP-2 component greatly outpaced those of the LT-Cage™. component. CW2,

19   *Id.* at ¶ 98; CW11, *Id.* at ¶ 107; CW12, *Id.* at ¶ 108.

20        h.     When questioned by a physician about how to use Infuse® off-

21   label, MEDTRONIC sales representatives directed physicians to other surgeons

22   who used the product off-label and also would demonstrate or explain how to do so.

23   CW3, *Id.* at ¶ 99; CW5, *Id.* at ¶ 101; CW6, *Id.* at ¶ 102; CW10, *Id.* at ¶ 106; CW11,

24   *Id.* at ¶ 107.

25        i.     MEDTRONIC held quarterly meetings in at least one sales

26   region, during which a national biologics specialist would attend to explain how to

27   conduct off-label applications of Infuse®. CW3, *Id.* at ¶ 99.

28

AMENDED COMPLAINT FOR DAMAGES
CASE NO. 13-01679

1      j.      MEDTRONIC directed its sales representatives to instruct

2   physicians to use half the dose of rhBMP-2 during cervical fusion, and

3   MEDTRONIC, aware of adverse events, instructed the representatives to tell

4   physicians to use steroids to combat potential inflammation. CW4, *Id*. at ¶ 100;

5   CW5, *Id*. at ¶ 101.

6      k.      MEDTRONIC directed physicians using the product in cervical

7   spine fusion to throw away a large portion, sometimes up to half, of the rhBMP-2

8   dosage. CW6, *Id*. at ¶ 102.

9      l.      MEDTRONIC gave to physicians a small book containing no

10  reference to MEDTRONIC, which contained information regarding the volume or

11  dosage of rhBMP-2 that should be used for off-label applications of Infuse®. CW7,

12  *Id*. at ¶ 103; CW8, *Id*. at ¶ 104; CW9, *Id*. at ¶ 105.

13     m.      MEDTRONIC instructed CW8 and others during sales

14  presentations regarding how to "get around" restrictions on off-label promotion.

15  CW8, *Id*. at ¶ 104.

16     n.      CW13 was brought into MEDTRONIC to develop a marketing

17  plan; which included: a) Development of a "referral marketing" campaign designed

18  to promote the product for off-label uses via a physician referral network; b)

19  identifying which surgeons would be targeted as part of MEDTRONIC's off-label

20  campaign and what claims MEDTRONIC would make about the product; c)

21  development of a "cookie- cutter" CD series that outlined MEDTRONIC's off-label

22  campaign and included information on off-label procedures that was distributed to

23  MEDTRONIC sales representatives. According to CW13, the referral marketing

24  program involved having surgeons meet with other surgeons as a means of

25  prompting discussion of off-label uses of Infuse® Bone Graft among practitioners.

26  CW13 also stated that MEDTRONIC used a physician training program involving

27  cadaver labs as a means to instruct surgeons regarding off-label applications.

28  CW13, *Id*. at ¶ 109.

AMENDED COMPLAINT FOR DAMAGES
CASE NO. 13-01679

1    o.     CW13 was rebuffed for raising concerns about off-label

2  promotion, and was told "we're paying you a lot of money to launch this. Shut your

3  mouth and take the money. Let us worry about what is off-label or isn't." CW13,

4  *Id.* at ¶ 110.

5    p.     A sales representative was present in the operating room during

6  an off-label cervical procedure which led to the patient's death. The patient's family

7  subsequently initiated civil litigation against MEDTRONIC and the sales

8  representative who was allegedly encouraging the off-label procedure at

9  MEDTRONIC's behest. *Id.* at ¶ 111.

10    q.     Although MEDTRONIC is under an obligation to report all

11  serious adverse events associated with Infuse®, MEDTRONIC failed to report the

12  death of this patient until three months after it occurred.  FDA guidelines

13  recommend that a manufacturer make a minimum of three attempts to retrieve

14  additional information regarding any adverse event. While the company filed an

15  adverse event report with the FDA in which it noted the complications immediately

16  following the procedure, MEDTRONIC did not inform the agency of her death

17  until after a lawsuit was filed by the patient's family and reported in *The Wall Street*

18  *Journal*. *Id.* at ¶ 112.

19    r.     In a separate civil suit against MEDTRONIC, a physician

20  admitted to attending numerous national spine meetings during which off-label uses

21  of rhBMP-2 in the cervical spine were promoted. A MEDTRONIC sales

22  representative was in the operating room a lot when he was performing off-label

23  uses. He admitted to doing over 100 cervical procedures, insinuating that the

24  MEDTRONIC sales representative was in the room for a fair number of these

25  procedures. *Id.* at ¶ 113.

26    202.   The plaintiffs in the *Minneapolis Firefighters* lawsuit also discovered

27  the growing percentage of off-label Infuse® usage from 2003-2007 by analyzing

28

surgical procedural codes used by hospitals.[37] The results of this analysis demonstrate that off-label usage of Infuse® was high, even from the inception of FDA approval, and increased by an astonishing 10% over the next 4 years; to wit:

| Year | Estimated On-Label Procedures | Estimated Off-Label Procedures |
|------|-------------------------------|--------------------------------|
| 2003 | 25.7% | 74.3% |
| 2004 | 20.6% | 79.4% |
| 2005 | 15.8% | 84.2% |
| 2006 | 15.3% | 84.7% |
| 2007 | 14.8% | 85.2% |

203.    Moreover, the data further demonstrate that off-label use of Infuse® in the cervical spine grew to as much as 18% of overall Infuse® use as of 2007, despite the known increased medical risks associated with that application.

204.    Indeed, to set sales projections for Infuse®, CW 2 stated that MEDTRONIC's marketing department accounted for the scope and number of procedures performed, including the numbers of off-label procedures, such as PLIFs and TLIFs, to predict sales projections. This analysis was based, in part, on data purchased from market research companies demonstrating the number of procedures involving different areas of the spine, e.g., certain lumbar (on- or off-label) versus cervical (off-label). Once MEDTRONIC determined its sales projections, these figures were incorporated into a budget presented to MEDTRONIC's senior management. Importantly, the final sales quotas for Infuse® were dictated by MEDTRONIC senior management, and were far in excess of what MEDTRONIC's Spinal Division had projected, or could be achievable absent promotion of the product for off-label uses.  According to CW 2, "when the numbers came back down, they never reflected the projections. They were much larger."

---

[37] The methodology employed was consistent with a July 1, 2009 report in the JAMA that conducted a retrospective cohort study of 328,468 patients undergoing spinal fusion procedures from 2002-2006, using the same codes from the NIS database.

1   205.   Numerous confidential witnesses, including CWs 1, 9, 12 and CW 14

2   (a senior manager for MEDTRONIC's Spinal and Biologics division from 2005 to

3   2008), confirm the intense pressure MEDTRONIC's management placed on its

4   sales representatives to meet the sales quotas the company set.  Like CW 2, CW 14

5   explained that sales goals were set by a handful of MEDTRONIC executives, and

6   that they were "very, very, very aggressive." Likewise, CW 12 stated that there was

7   a lot of pressure on MEDTRONIC's Spinal and Biologics division to reach

8   unreasonable sales targets.

9   206.   As demonstrated, by years 2006-07, off-label uses accounted for an

10  astounding 85% of Infuse® sales; a fact known or recklessly disregarded by all

11  employees, who reviewed marketing data and analyses to set sales quotas for

12  Infuse®. Indeed, sales quotas for Infuse® required sales to grow 20% year-over-

13  year, and MEDTRONIC knew that such increases could not be achieved without

14  substantial off-label sales, and thus that such aggressive targets would encourage

15  off-label promotion by its employees and representatives.

16  207.   In June 2011, one of the leading journals on spine surgery, *The Spine*

17  *Journal*, described more fully *supra*, devoted an entire issue to publishing various

18  articles regarding the risks associated with Infuse®, including articles on

19  MEDTRONIC's failure to accurately report the side effects from its clinical trials;

20  MEDTRONIC's failure to report that many of the authors who studied and

21  promoted Infuse® had significant financial ties to MEDTRONIC, with a median

22  range of $12 to $16 million per study; that Infuse® can cause severe injuries to the

23  spinal nerves and spinal cord; that off-label use of Infuse® can lead to other severe

24  side effects; and that MEDTRONIC and its paid consultants/study authors

25  downplayed the risks associated with Infuse®, over-emphasized its benefits and

26  over-emphasized the risks associated with traditional non-Infuse® spine fusion

27  procedures.

28

AMENDED COMPLAINT FOR DAMAGES
CASE NO. 13-01679

**c)**   **U.S. Senate Investigation**

**i)**      **September 30, 2008 Letter.**

208.    Despite the July 2006 Settlement with the DOJ, concerns regarding MEDTRONIC's off-label marketing activities and related payments to doctors continued.

209.    On September 30, 2008, U.S. Senator Herb Kohl sent a letter to MEDTRONIC noting that earlier in 2008, MEDTRONIC's outside counsel provided to the Special Committee on Aging a written account of MEDTRONIC's efforts to comply with the July 2006 Settlement Agreement it reached with the DOJ concerning allegations that MEDTRONIC and its subsidiary improperly compensated surgeons and physicians in connection with the Infuse® device.

210.    Senator Kohl's letter expressed several concerns, including the following:

> That account also addressed the corporate integrity agreement (CIA) that MEDTRONIC and its subsidiary entered into with the Office of the Inspector General of the United States Department of Health and Human Services stemming from those same allegations.  In that same letter to the Committee, MEDTRONIC and its subsidiary both denied that "improper payments were made to physicians in the first place (MEDTRONIC's agreement with DOJ does not contain any admission of liability), much less that improper payments 'have continued.'  Consequently, it was with concern that I read recent articles, in the *Wall Street Journal* and elsewhere, which outlined highly disturbing allegations of improper, if not illegal, payments by MEDTRONIC to surgeons and physicians.
>
> These continuing allegations are directly relevant to the Committee's oversight of inappropriate physician compensation practices within the

medical device industry.  All of the major orthopedic device companies that settled with DOJ over such allegations were required to publicly reveal information related to their payments to physicians. MEDTRONIC's response to the Committee's initial inquiry articulated no specific reasons as to why MEDTRONIC has yet to voluntarily make the same disclosures.

211.    In this letter, Senator Kohl requested both documentation of MEDTRONIC's efforts to comply with the July 2006 Settlement Agreement and interviews with corporate witnesses and documents "given the ongoing, serious concerns publicly raised regarding the integrity and transparency of MEDTRONIC's physician compensation practices."

212.    Senator Kohl also asked MEDTRONIC to explain "the circumstances that led MEDTRONIC's former counsel to file suit against the company [alleging improper payments to physicians] and how that matter was subsequently settled."

213.    Also on September 30, 2008, U.S. Senator Charles Grassley sent a similar letter to MEDTRONIC pertaining to the marketing of Infuse® and allegations of related kickbacks to physicians regarding the sale of Infuse®, noting that:

Last week, the *Wall Street Journal (WSJ)* reported on allegations of financial perks provided to doctors that included "entertainment at a Memphis strip club, trips to Alaska and patent royalties on inventions they played no part in."[38]  I would appreciate your assistance in better understanding these allegations and would like to take this opportunity to lay out my specific concerns and questions.

214.    Senator Grassley went on to express his concern over the *Wall Street Journal*'s reports "that one of the incentives MEDTRONIC provided physicians

---

[38]  David Armstrong, "Lawsuit Says MEDTRONIC Gave Doctors Array of Perks," *Wall St. J.*, Sept. 25, 2008.

1   was to include them on patents for medical devices and reward them with royalties,

2   even though the physicians may not have contributed to the development of the

3   product."

4   215.   This letter specifically addressed issues related to MEDTRONIC's

5   marketing of Infuse®:

6   Fourth, earlier this month the WSJ reported on problems with off-label

7   use of MEDTRONIC's Infuse®.  Infuse® is a bone graft replacement

8   technology that uses a protein which creates bone.  Specifically, it was

9   reported that MEDTRONIC gave payments to physicians, in the form

10   of consulting agreements, as a means of increasing sales of Infuse®.

11   The allegations that MEDTRONIC has been disguising these

12   consulting agreements as inducements or kickbacks for physicians to

13   use Infuse® are equally troubling.  Likewise, this is a practice that I

14   would like to better understand and I would like to know what if

15   anything has changed since these reported events.

16   216.   Senator Grassley, in his September 30, 2008 letter, also questioned

17   why several lawsuits against MEDTRONIC pertaining to Infuse® remained under

18   seal, and indicated that he would like to "better understand the status of these

19   lawsuits and the procedural process that has led to the current situation."

20   ii)   **June 21, 2011 Letter.**

21   217.   The U.S. Senate Committee on Finance investigated whether

22   MEDTRONIC has continued to misrepresent the adverse events that result from

23   Infuse® and rhBMP-2, as well as the possibility that MEDTRONIC improperly

24   influenced clinical trials and reporting regarding rhBMP-2.

25   218.   On June 21, 2011, U.S. Senators Charles Grassley and Max Baucus

26   sent another letter to MEDTRONIC on behalf of the Senate Committee on Finance

27   requesting that MEDTRONIC produce documents and communications pertaining

28   to "adverse postoperative events and/or medical complications" resulting from the

-65-

use of rhBMP-2.[39]  The letter also requests that MEDTRONIC provide "[a] detailed account of payments that MEDTRONIC made to all Infuse® clinical investigators."

219.    In their June 21, 2011 letter, Senators Grassley and Baucus state: "We are extremely troubled by press reports suggesting that doctors conducting clinical trials examining the safety and effectiveness of Infuse® on behalf of MEDTRONIC were aware that Infuse®, a treatment commonly used in spinal surgery, may cause medical complications, but failed to report this in the medical literature.  This issue is compounded by the fact that some clinical investigators have substantial financial ties to MEDTRONIC."

220.    The letter further states:  "We are also concerned that other severe side-effects of Infuse® and similar bone-growth products developed by MEDTRONIC may have been unreported or under-reported in clinical literature.  Reports have linked Infuse® to potentially fatal swelling in the neck and throat, and radiating leg pain.  Concerns have also been expressed about a potential link to cancer."

### iii)    December 13, 2011 Letter

221.    Senators Herb Kohl, Charles Grassley, and Richard Blumenthal wrote to MEDTRONIC again in December 2011 demanding more information from the company over adverse events caused by on-label and off-label use of Infuse®.  The letter noted that "your company has experienced safety issues, such as with your spine product Infuse®."

222.    The letter also demanded that MEDTRONIC explain whether or not it requires physicians who receive funds from MEDTRONIC to disclose those payments to their patients before the patients receive one of MEDTRONIC's medical devices and "If not, why not?"

---

[39] Letter from Grassley and Baucus (June 21, 2011), *available at*, http://finance.senate.gov/newsroom/chairman/release.

AMENDED COMPLAINT FOR DAMAGES
CASE NO. 13-01679

223.     This new letter requires that MEDTRONIC produce this information to the U.S. Senate's Special Committee on Aging by no later than January 23, 2012.

224.     On information and belief, this continued investigation by a U.S. Senate committee suggests that MEDTRONIC has not changed its ways with regard to its illegal promotion of Infuse®, despite signing the CIA and paying a $40 million fine to DOJ in 2006.

**11)     Allegations in Support of Punitive Damages**

225.     Plaintiff incorporates by reference all previous and subsequent paragraphs of this Complaint as if fully set forth here and further alleges as follows:

226.     At all times herein referenced, officers, directors, and managing agents of MEDTRONIC knew, and were aware, and concealed, hid, and/or otherwise downplayed the true risks of non-FDA approved off-label uses of its product Infuse®.

227.     At all times herein referenced, officers, directors, and managing agents of MEDTRONIC knew, and were aware, that numerous people had ectopic bone formation, radiculitis, osteolysis, cage migration, and worse overall outcomes as a result of non-FDA approved off-label uses of its product Infuse®.

228.     The MEDTRONIC defendants designed, engineered, developed, manufactured, fabricated, assembled, equipped, tested or failed to test, inspected or failed to inspect, labeled, advertised, promoted, marketed, supplied, distributed, wholesaled, and sold Infuse®, a product which said Defendants knew to be dangerous and unsafe for the purpose for which they intended it to be used, namely, as a bio-engineering bone draft device in spinal fusion surgeries.

229.     At all times herein mentioned, prior to and at the time that Defendants designed, developed, manufactured, promoted, marketed, supplied, distributed, tested or failed to test, and/or sold Infuse® to Plaintiff and Plaintiff's physicians, and prior to the time that said product was used, MEDTROINC knew, or should have known, that  Infuse®  was defectively designed and manufactured, that it had

1   extremely dangerous properties and defects, and that it had defects which would

2   cause serious injuries and damage to users of said product, thereby threatening the

3   life and health of the users.  Further, at all times, all Defendants knew that Infuse®

4   had caused serious injuries and damage to other members of the public.

5       230.    At all times herein mentioned, all Defendants, despite the actual

6   knowledge described hereinabove, intentionally suppressed the adverse events and

7   other complaints and reports of injuries, actively concealed and downplayed the

8   risks associated with Infuse®, actively promoted the off-label use of Infuse®, failed

9   to warn Plaintiff and the medical community of the true risks associated with

10  Infuse®, saturated the scientific and medical literature with biased, industry-funded

11  studies to conceal the true risks of Infuse®, and otherwise failed to warn Plaintiff,

12  the medical community, and/or the general public of the true risks of off-label use

13  of Infuse®.

14      231.    At all times herein mentioned, Defendants had actual knowledge of the

15  facts hereinabove alleged demonstrating that serious injury to patients in which

16  Infuse® was implanted, particularly in an off-label manner such as posterior lumbar

17  fusion surgery Plaintiff underwent.  Defendants nevertheless deliberately

18  suppressed, concealed, downplayed, and/or otherwise hid any information

19  demonstrating the true risks associated with Infuse® from Plaintiff, the medical

20  community, and/or the general public.  Instead, Defendants continued to actively

21  promote the off-label use of Infuse® to spine surgeons in an effort to maintain and

22  increase Infuse®'s enormous profitability.

23      232.    As a legal and proximate result of Defendants' conduct, as herein

24  alleged, Plaintiff sustained the injuries and damages set forth above.

25      233.    Defendants' conduct and omissions, as set forth above, in allowing

26  such an extremely dangerous product to be used by members of the general public,

27  including Plaintiff, constitutes fraud, malice and oppression toward Plaintiff and

28

AMENDED COMPLAINT FOR DAMAGES
CASE NO. 13-01679

1    others, and demonstrates a callous and conscious disregard of the safety of Plaintiff

2    and others.

3         234.   Plaintiff is therefore entitled to exemplary or punitive damages, which

4    would serve to punish the Defendants and to deter wrongful conduct in the future.

5         235.   Plaintiff is therefore entitled to judgment against Defendants as

6    hereinafter set forth.

7         a)     **Infuse® is Profitable and thus MEDTRONIC had an Economic**

8              **Motive to Promote Infuse Off-label.**

9         236.   Infuse® has become a best seller for MEDTRONIC.  MEDTRONIC's

10   Infuse® sales have exceeded $3.6 billion since the launch of the Infuse® Bone Graft

11   in July 2002. As a J.P. Morgan research analyst covering MEDTRONIC noted in a

12   report dated November 12, 2008:

13        Infuse® is an $800M product for MEDTRONIC (6% of sales), having

14        enjoyed robust growth since its initial approval in the U.S. in July

15        2002. In fact, it is the one piece of MEDTRONIC's Spine business that

16        continues to post strong double-digit growth without any issues (LTM:

17        +16.9%). That is, until now.

18        237.   MEDTRONIC has depended heavily on Infuse® sales because so many

19   of its other products, such as cardiac defibrillators, have slowed as the result of

20   recalls of those defective defibrillators in the past several years.

21        238.   Revenue generated by sales of Infuse® was approximately $800

22   million for the 2011 fiscal year, and the vast majority of these sales were

23   attributable to off-label use of the product.  Off-label uses of Infuse® account for

24   85% to 90% of all spine surgeries involving Infuse®.

25        239.   Plaintiff is informed and believes and based thereon alleges that, as a

26   result of MEDTRONIC's illegal and improper off-label promotion, sales of Infuse®

27   have soared and have totaled more than 4 billion of dollars from 2002 to 2011.

28

AMENDED COMPLAINT FOR DAMAGES
CASE NO. 13-01679

240.   MEDTRONIC has consistently sought to expand the use of Infuse® by, among other things, illegally and improperly promoting dangerous and/or insufficiently studied off-label uses for Infuse® in various parts of the spine for various types of spine surgeries, as discussed throughout this Complaint.

**b)**      **June 1, 2011 Issue of *The Spine Journal*.**

241.   On June 1, 2011, the *Spine Journal*, a leading medical journal in the United States, published a special edition dedicated to addressing serious patient safety and ethical concerns related to the use of rhBMP-2 (Infuse®) in the spine.

242.   This special edition reviewed thirteen peer-reviewed articles about rhBMP-2 by MEDTRONIC-sponsored authors, and concluded that these articles had inaccurately reported the safety of rhBMP-2 applications in the spine by underestimating its risks.

243.   In an editorial summarizing the findings of this special issue, five prominent physicians, including spine surgeons at Stanford University Medical Center, wrote that the earlier industry-sponsored trials and reports were "remarkable for the complete absence of reported rhBMP-2-related clinical adverse events."  For example, the industry-sponsored articles omitted mention of indications from the earliest trials of inflammatory reactions, adverse back and leg pain events, radiculitis, retrograde ejaculation, urinary retention, bone resorption, and implant displacement.  They also omitted mention of sterility and cancer risks associated with rhBMP-2, as reported in FDA documents and hearings.  The trials and reports suffered from idiosyncratic trial design, reporting bias, and peer-review/publication shortfalls.

244.   According to this editorial and several of the accompanying articles in the *Spine Journal*, the thirteen MEDTRONIC-funded articles reported only successful fusions and extremely low or nonexistent rates of complications with Infuse®, which led to the growth of "off-label" use of Infuse® in lumbar fusion

1  procedures.  The articles "may have promoted widespread poorly considered on-

2  and off-label use, eventual life-threatening complications and deaths."

3      245.   Contrary to the conclusions of the earlier MEDTRONIC-sponsored

4  trials and articles, an article in this special issue of the *Spine Journal* suggested "an

5  estimate of adverse events associated with rhBMP-2 use in spine fusion ranging

6  from 10% to 50% depending on approach."

7        Anterior cervical fusion with rhBMP-2 has an estimated 40% greater

8        risk of adverse events with rhBMP-2 in the early postoperative period,

9        including life-threatening events.  After anterior interbody lumbar

10       fusion rates of implant displacement, subsidence, infection, urogenital

11       events, and retrograde ejaculation were higher after using rhBMP-2

12       than controls.  *Posterior lumbar interbody fusion was associated with*

13       *radiculitis, ectopic bone formation, osteolysis, and poorer global*

14       *outcomes.*  In posterolateral fusions, the risk of adverse effects

15       associated with rhBMP-2 use was equivalent to or greater than that of

16       iliac crest bone graft harvesting, and 15% to 20% of subjects reported

17       early back pain and leg pain adverse events; higher doses of rhBMP-2

18       were also associated with a greater apparent risk of new malignancy."

19
20 Eugene J. Carragee, Eric L. Hurwitz & Bradley K. Weiner, *A Critical Review Of*

21 *Recombinant Human Bone Morphogenetic Protein-2 Trials In Spinal Surgery:*

22 *Emerging Safety Concerns And Lessons Learned*, *The Spine Journal* 11, 471-72

23 (2011) (emphasis added).

24     246.   This article also reported that ten of the earlier industry-sponsored

25 rhBMP-2 trials were funded in whole or in part by the manufacturer of rhBMP-2

26 (Infuse®), MEDTRONIC.  Furthermore, in twelve of these earlier studies, the

27 median-known financial association between the authors and MEDTRONIC Inc.

28

1  was approximately $12,000,000-$16,000,000 per study (range, $560,000-

2  $23,500,000).  *Id.* at 475.

3      247.   The following are some of the other significant conclusions in these

4  articles in the June 1, 2011 Issue of *The Spine Journal*:

5          a.   Many of the risks now accepted have been known since a

6  publication by Poynton and Lane in 2002, which listed overgrown and uncontrolled

7  bone formation, osteoclast activity (graft subsidence, migration, loss of fixation

8  etc.), local safety (inflammation, edema, wound problems, and infection), potential

9  negative effect of BMPs on exposed dura and nerves (neurologic events, retrograde

10 ejaculation, persistent bladder retention, early back pain, leg pain, radiculitis,

11 functional loss, carcinogenicity). *However, it appears that these risks were*

12 *ultimately washed out and marginalized by the wealth of positive data from*

13 *industry-sponsored studies.*

14         b.   A 2-year rhBMP-2 follow-up published by Burkus, et al.,

15 reported no adverse events. However, in a 6-year follow-up publication using the

16 same subjects, the authors contradict their earlier publication stating that there had

17 been seven early adverse events associated with subsidence in the rhBMP-2 group,

18 yet they were not reported in the two year follow-up.

19         c.   In fact, on closer inspection of the Burkus studies, it was noted

20 that all adverse events mentioned in the six-year follow-up had occurred within the

21 first two years.

22         d.   Furthermore, four of the adverse events required further surgery,

23 and 22 additional surgeries for device failures occurred in the same rhBMP-2 group

24 between 0-2 years after surgery according to the FDA summary, but were not

25 specifically reported in the 2003 or 2004 studies, which were the same patients over

26 the same time frame.

27         e.   The estimates of rhBMP-2 safety from the original publications

28 underestimated rhBMP-2-related adverse events of the product. In the small pilot

studies, there were inadequate numbers to assess safety, but some suggestion of potential harm was seen in at least one study. In the larger trials, there is evidence in each trial that rhBMP-2 complications may be common and may be serious, but in each publication these were underreported.

f.      The presence and magnitude of conflicts-of-interest and the potential for reporting bias were either not reported or were unclear in each of the original industry sponsored studies. Some of the conflicts-of-interest statements reported appeared to be vague, unintelligible, or were internally inconsistent.

g.      The original estimates of ICBG (Iliac Crest Bone Graft, the pre-rhBMP-2 gold standard procedure for spinal fusion) harvesting morbidity were based on invalid assumptions and methodology. This in turn may have exaggerated the benefit or underestimated the morbidity of rhBMP-2 in the clinical situations tested.

h.      The control group methods and techniques, as selected for both posterior approach methods (PLIF and PLF) were potentially handicapped by significant design bias against the controls.

i.      In those studies for which other data sources have been made available on the same patient sets (either FDA documents or subsequent reporting of follow-up data), serious contradictory findings have emerged. Major complications, additional surgeries, neurologic/urologic injury, and major back/leg pain events were apparently observed but not reported in the original articles.

j.      By falsely reporting perfect or near perfect safety, the original studies might have led others to widespread off-label use of the product with some potentially catastrophic outcomes. Revised estimates of adverse events are:

i.      Posterior lumbar interbody fusion techniques:  25-50% risk of associated adverse events.

ii.      Anterior lumbar interbody fusion:  10-15% risk of adverse events.

iii.      Anterior cervical fusion:  40% greater risk of adverse

events in the acute postoperative period including potentially life-threatening

complications.

iv.      Posterolateral fusions: equivalent or greater early

postoperative risk of morbidity compared with ICBG harvesting for this dosage;

16-20% of rhBMP-2 subjects had adverse back and leg pain events, *a probable two*

*to threefold increase in the first three months after surgery over control groups*

(emphasis added).

c)      **October 25, 2012 U.S. Senate Committee on Finance Report**

248.      On October 25, 2012, Senate Finance Committee released the results

of its 16-month investigation into MEDTRONIC, which revealed questionable ties

between the company and its physician "Opinion Leader" consultants tasked with

testing and reviewing Infuse®.  Ex. C, Senate Finance Committee Report.[40]

Without public disclosure of their roles, MEDTRONIC employees collaborated

with the physician authors to edit – and in some cases, write – segments of

published studies on Infuse®.  The studies may have inaccurately represented

Infuse®'s risks and may have overemphasized the side effects of prior more

traditional treatments.  The Senate report found that MEDTRONIC also maintained

significant, previously-undisclosed financial ties with the physicians who authored

the early studies on Infuse®, making $210 million in payments to physicians over a

15-year period.

249.      The major findings of the investigation include:

a.      MEDTRONIC was involved in drafting, editing, and shaping

the content of medical journal articles on Infuse® authored by its physician

consultants who received significant amounts of money through royalties and

---

[40] The Senate's full report is available online at:
http://www.finance.senate.gov/newsroom/chairman/download/?id=e54db17c-a475-4948-bd81-69c8740c6aaf. In the interest of brevity, Plaintiff has not attached the full 2,315 page report.

AMENDED COMPLAINT FOR DAMAGES
CASE NO. 13-01679

1   consulting fees from MEDTRONIC.  The company's significant role in authoring

2   or substantively editing these articles was not disclosed in the published articles.

3   Medical journals should ensure any industry role in drafting articles or

4   contributions to authors be fully disclosed.

5           b.     MEDTRONIC paid a total of approximately $210 million to

6   physician authors of MEDTRONIC-sponsored studies from November 1996

7   through December 2010 for consulting, royalty and other arrangements.

8           c.     An e-mail exchange shows that a MEDTRONIC employee

9   recommended against publishing a complete list of adverse events, or side effects,

10  possibly associated with Infuse® in a 2005 *Journal of Bone and Joint Surgery*

11  article.

12          d.     MEDTRONIC officials inserted language into studies that

13  promoted Infuse® as a better technique than an alternative by emphasizing the pain

14  associated with the alternative.

15  *Id.* at 2.

16  **12)**    **Plaintiff-specific Allegations**

17      250.   On October 3, 2008, Plaintiff JENNIFER HOUSTON underwent a

18  posterior-approach lumbar fusion at levels L4-L5-S1 using off-label Infuse®.  The

19  surgery was performed by Brian Perri, D.O.  The use of Infuse® was off-label in

20  this surgery because (1) it was implanted by means of a posterior approach, and (2)

21  the requisite LT-Cage™ was not used.

22      251.   Prior to this surgery, MEDTRONIC did not inform Plaintiff

23  JENNIFER HOUSTON that there were any risks specific to the use of Infuse® in

24  the lumbar spine, and MEDTRONIC did not adequately inform her implanting

25  surgeon, Dr. Perri, of the true incidence of ectopic or uncontrolled or unusual bone

26  growth resulting from the use of Infuse® in off-label procedures, or of other risks or

27  dangers or complications associated with the off-label use of Infuse® in the spine.

28

AMENDED COMPLAINT FOR DAMAGES
CASE NO. 13-01679

252.    As of October 2008, Dr. Perri was not aware of the full extent of the risk of bone overgrowth induced by bone morphogenetic proteins, such as Infuse®.

253.    Prior to conducting JENNIFER HOUSTON's 2008 off-label Infuse® surgery, Dr. Perri listened to Medtronic consultant, Dr. Boden, speak several times regarding Infuse® at Cedar Sinai Hospital in Los Angeles.  During these presentations, Dr. Boden did not mention anything regarding bone overgrowth or radiculitis.  In addition, prior to conducting JENNIFER HOUSTON's 2008 off-label Infuse®, Dr. Perri also believes that he read articles by Dr. Burkus and Dr. Haid endorsing the use of Infuse®, as safe and effective, while failing to warn of the true risks of bone overgrowth and inflammatory reactions.  Finally, Dr. Perri attended several professional society meetings, including meetings of the North American Spine Society, in which the off-label use of Infuse® was discussed without warnings regarding the problems associated with bone morphogenic, radiculitis or other problems.  Dr. Boden, Dr. Burkus or Dr. Zdeblick presented at one or more of these NASS meetings.  Information regarding such risks and warnings would have been important to Dr. Perri's assessment of the risk versus benefit of using Infuse® in any off-label procedure.

254.    It was not until the Summer of 2011 that Dr. Perri read articles in the *Spine Journal* describing the significant rates of ectopic bone growth associated with the off-label uses of Infuse® in the spine, which were higher than had been reported previously.  Had he known in 2008, what he knows now regarding the true rate of uncontrolled bone growth in the off-label use of Infuse® and other associated risks, he would have used another bone graft material, such as autograft, in JENNIFER HOUSTON's surgery, or warned her of the specific dangers, including the risk of uncontrolled bone growth, and he could have been in a position to take additional measures to reduce the risk of bone overgrowth.  Indeed, the Oregon Health and Science University team, commissioned to conduct an independent

1    review of Infuse®, noted that an earlier release of all relevant data would have

2    better-informed clinicians and patients making medical decisions.

3         255.    Plaintiff JENNIFER HOUSTON's post-operative period was marked

4    by increasingly severe pain.

5         256.    Imaging studies ultimately showed that Plaintiff JENNIFER

6    HOUSTON had developed uncontrolled bone growth (aka "bone overgrowth") and

7    resulting nerve compression at or near where the Infuse® was implanted in the

8    October 3, 2008 surgery.  Indeed, these injuries and complications are the direct

9    and proximate result of the use of off-label Infuse® in this surgery.

10        257.    The Fall of 2011 was the first time that Plaintiff JENNIFER

11   HOUSTON had reason to suspect that her chronic pain was caused by Infuse®-

12   induced bone overgrowth.   In fact, it was not until approximately August of 2011

13   that Plaintiff even learned that Infuse® was used in her 2008 lumbar fusion surgery

14   and that it was causing her multiple complications and injuries.

15        258.    Thus, Plaintiff did not know, and could not have known by the

16   exercise of reasonable diligence, until August 2011 at the earliest that the off-label

17   use of Infuse® caused her bone overgrowth injury and her other serious injuries.

18        259.    Before and after the implantation surgery using Infuse®,

19   MEDTRONIC knowingly concealed from Plaintiff and her implanting surgeon, Dr.

20   Perri, the significant rate of injuries and complications resulting from the off-label

21   use of Infuse®.  MEDTRONIC'S improper promotion of Infuse® and

22   MEDTRONIC's concealment from Dr. Perri of serious patient safety risks

23   associated with off-label Infuse® were significant causes or contributing factors in

24   Dr. Perri's decision to use off-label Infuse® in his patient JENNIFER HOUSTON.

25        260.    MEDTRONIC's fraudulent concealment of the relevant facts tolled

26   any relevant statutes of limitation.

27        261.    As a direct and proximate result of the use of Infuse® in this lumbar

28   fusion surgery, Plaintiff JENNIFER HOUSTON now suffers from severe injuries

-77-

1   and damages, including but not limited to bone overgrowth causing nerve

2   compression, chronic pain and radiculitis, and emotional distress and mental

3   anguish.

4       262.   As a direct and proximate result of the use of Infuse® in this lumbar

5   fusion surgery, Plaintiff JENNIFER HOUSTON has been forced to undergo

6   multiple painful and expensive revision surgeries performed by Dr. Perri to attempt

7   to remove the BMP-induced bone overgrowth.

8       263.   As a result of the off-label use and failure to warn of the risks of off-

9   label use of Infuse® as manufactured, sold and supplied by MEDTRONIC, and as

10  a result of the  negligence, callousness and the other wrongdoing and misconduct of

11  MEDTRONIC, as described herein:

12      264.   Plaintiff JENNIFER HOUSTON has been injured and suffers injuries

13  to her body and mind, the exact nature of which are not completely known to date;

14      265.   Plaintiff JENNIFER HOUSTON has sustained economic losses,

15  including loss of earnings and diminution of the loss of earning capacity, the exact

16  amount of which is presently unknown.

17      266.   Plaintiff JENNIFER HOUSTON will be required to incur additional

18  medical expenses in the future to care for herself as a result of the injury and

19  damages she has suffered.

20      267.   Plaintiff is therefore entitled to damages in an amount to be proven at

21  trial, together with interest thereon and costs.

22      268.   Defendant's conduct as alleged above was malicious, intentional and

23  outrageous and constitutes a willful and wanton disregard for the rights and safety

24  of others.  Such conduct was directed specifically at Plaintiff and as such, warrants

25  an imposition of punitive damages.

26

27

28

**CLAIMS FOR RELIEF**

**FIRST CAUSE OF ACTION**
**Fraudulent Misrepresentation and Fraud in the Inducement**
**(By Plaintiff against the MEDTRONIC Defendants)**

269.    Plaintiff incorporates by reference all previous and subsequent paragraphs of this Amended Complaint as if fully set forth here and further alleges as follows:

270.    In connection with their Infuse® products, the MEDTRONIC Defendants fraudulently and intentionally misrepresented material and important health and safety product risk information from Plaintiff and Plaintiff's physicians, all as alleged in this Amended Complaint.  The specifics regarding the content of the misrepresentations, when and where MEDTRONIC made them, and to whom they were made, as well as what aspects of the statements were misleading and why, are alleged above in the body of this Amended Complaint.  Plaintiff and Plaintiff's physicians would not have decided to use Infuse® without an LT-Cage™® or to implant it via posterior or lateral approaches using cages other than an LT-Cage™® had they known of the safety risks related to Infuse®.

271.    The MEDTRONIC Defendants marketed their Infuse® product to and for the benefit of Plaintiff, and marketed it to Plaintiff's physicians, and Defendants knew or had reason to know of the unreasonable dangers and defects in their Infuse® product, and knew or had reason to know that Plaintiff and Plaintiff's physicians would use the product.

272.    Any of the following is sufficient to independently establish the MEDTRONIC Defendants' liability for fraudulent misrepresentation and/or fraud in the inducement:

        a.      The MEDTRONIC Defendants fraudulently concealed and misrepresented the health and safety hazards, symptoms, constellation of symptoms, diseases and/or health problems associated with the off-label use of Infuse®;

AMENDED COMPLAINT FOR DAMAGES
CASE NO. 13-01679

1          b.        The MEDTRONIC Defendants fraudulently concealed and

2    misrepresented their practice of promoting and marketing to physicians, including

3    Plaintiff's physician, the off-label practice of using of Infuse® without an LT-

4    Cage™® and placing it posteriorly or laterally;

5          c.        The MEDTRONIC Defendants fraudulently concealed and

6    misrepresented information about the known comparative risks and benefits of the

7    use of Infuse® and the relative benefits and availability of alternate products,

8    treatments and/or therapies.

9          273.    The MEDTRONIC Defendants knew, or should have known, that they

10   were concealing and misrepresenting true information about the known

11   comparative risks and benefits of the use of Infuse® and the relative benefits and

12   availability of alternate products, treatments and/or therapies.

13         274.    The MEDTRONIC Defendants knew that Plaintiff and Plaintiff's

14   physicians would regard the matters Defendants concealed and misrepresented to

15   be important in determining the course of treatment for the Plaintiff, including

16   Plaintiff and Plaintiff's physician's decision whether or not to use Infuse® without

17   an LT-Cage™® or to place it via a posterior or lateral approach in Plaintiff's lumbar

18   spine fusion surgery.

19         275.    The MEDTRONIC Defendants intended to cause Plaintiff and

20   Plaintiff's physicians to rely on their concealment of information and

21   misrepresentations about the safety risks related to Infuse® to induce them to make

22   off-label use of Infuse® for Plaintiff's lumbar spine fusion surgery.

23         276.    Plaintiff and Plaintiff's physicians were justified in relying, and did

24   rely, on MEDTRONIC's concealment of information and misrepresentations about

25   the safety risks related to Infuse® in deciding to make use of Infuse® in an off-label

26   manner in Plaintiff's lumbar spine fusion surgery.

27         277.    As the direct, proximate and legal cause and result of the Defendants'

28   fraudulent concealment and misrepresentations and suppression of material health

1  and safety risks relating to Infuse® and Defendants' dangerous and irresponsible

2  marketing and promotion practices, Plaintiff has been injured and has incurred

3  damages, including but not limited to medical and hospital expenses, lost wages

4  and lost earning capacity, physical and mental pain and suffering, and loss of the

5  enjoyment of life.

6      278.   As a result of the off-label use and failure to warn of the risks of off-

7  label use of Infuse®  as manufactured, sold and supplied by MEDTRONIC, and as

8  a result of the  negligence, callousness and the other wrongdoing and misconduct of

9  MEDTRONIC, as described herein:

10     279.   Plaintiff JENNIFER HOUSTON has been injured and suffers injuries

11  to her body and mind, the exact nature of which are not completely known to date;

12     280.   Plaintiff JENNIFER HOUSTON has sustained economic losses,

13  including loss of earnings and diminution of the loss of earning capacity, the exact

14  amount of which is presently unknown.

15     281.   Plaintiff JENNIFER HOUSTON will be required to incur additional

16  medical expenses in the future to care for herself as a result of the injury and

17  damages she has suffered.

18     282.   Plaintiff is therefore entitled to damages in an amount to be proven at

19  trial, together with interest thereon and costs.

20     283.   Defendants' conduct as alleged above was malicious, intentional and

21  outrageous and constitutes a willful and wanton disregard for the rights and safety

22  of others.  Such conduct was directed specifically at Plaintiff and as such, warrants

23  an imposition of punitive damages.

24               **SECOND CAUSE OF ACTION**
                 **Strict Products Liability – Failure To Warn**
25           **(By Plaintiff against the MEDTRONIC Defendants)**

26     284.   Plaintiff incorporates by reference all previous and subsequent

27  paragraphs of this Amended Complaint as if fully set forth here and further alleges

28

1   two theories underlying her failure to warn claim, described above, and further

2   claims the following:

3      285.   MEDTRONIC had a duty to warn Plaintiff and Plaintiff's physicians

4   about the dangers of Infuse® of which it knew, or in the exercise of ordinary care,

5   should have known, at the time the Infuse® left the Defendants' control.  The

6   MEDTRONIC Defendants did know of these dangers of off-label use of Infuse®,

7   and breached this duty by failing to warn Plaintiff and Plaintiff's physicians of the

8   dangers of its off-label practice of using Infuse® without an LT-Cage™® and

9   placing it posteriorly or laterally in a lumbar spine fusion surgery.

10     286.   Defendants, and each of them, knew that Infuse® would be purchased

11  and used without inspection for defects in the design of the product.

12     287.   The Infuse® used in Plaintiff was defective when it left the control of

13  each of these Defendants.

14     288.   Defendants knew or should have known of the substantial dangers

15  involved in the reasonably foreseeable use of Infuse®, whose defective design,

16  manufacturing, and lack of sufficient warnings caused Infuse® to have an

17  unreasonably dangerous propensity to cause catastrophic injuries.

18     289.   The warnings accompanying the Infuse® product did not adequately

19  warn Plaintiff and Plaintiff's physicians, in light of the scientific and medical

20  knowledge at the time, of the dangers associated with Infuse® when used without an

21  LT-Cage™® and placed posteriorly or laterally in a lumbar spine fusion surgery

22  including, but not limited to, pain and weakness in limbs, radiculitis, ectopic bone

23  formation, osteolysis, and poorer global outcomes than alternative treatments.

24     290.   The warnings accompanying the Infuse® product failed to provide the

25  level of information that an ordinary physician or consumer would expect when

26  using the product in a manner reasonably foreseeable to MEDTRONIC.

27  MEDTRONIC either recklessly or intentionally minimized and/or downplayed the

28

1   risks of serious side effects related to the off-label use of Infuse®, including but not

2   limited to the risk of ectopic or uncontrolled bone growth.

3       291.    Defendants failed to provide adequate warnings, instructions,

4   guidelines or admonitions to members of the consuming public, including Plaintiff

5   and Plaintiff's physicians, of the problems with off-label use of Infuse®, which

6   Defendants knew, or in the exercise of reasonable care should have known, to have

7   existed in Infuse®.

8       292.    Defendants knew that these substantial dangers are not readily

9   recognizable to an ordinary consumer or physicians, and that consumers and

10  physicians would purchase Infuse® without inspection.

11      293.    At the time of Plaintiff's injury, Infuse® was being used in a manner

12  promoted by Defendants, and in a manner that was reasonably foreseeable by

13  Defendants as involving substantial danger that was not readily apparent to its

14  users.

15      294.    Plaintiff's physician relied on MEDTRONIC's inadequate warnings in

16  deciding to use Infuse® in an off-label manner.  Plaintiff and Plaintiff's physician

17  would not have made off-label use of Infuse® without an LT-Cage™® and

18  placement of it posteriorly or laterally had they known of the true safety risks

19  related to Infuse®.

20      295.    As a direct and proximate result of one or more of the above-listed

21  dangerous conditions and defects, and of MEDTRONIC's failure to provide

22  adequate warnings about them, Plaintiff sustained serious injuries of a personal and

23  pecuniary nature from approximately February 2009 to the present.

24      296.    Plaintiff has sustained extreme pain, suffering, and anguish from the

25  date of Plaintiff's lumbar spine fusion surgery in which Infuse® was implanted

26  without an LT-Cage™® and was placed posteriorly or laterally until the present.

27      297.    As a result of the off-label use and failure to warn of the risks of off-

28  label use of Infuse®  as manufactured, sold and supplied by MEDTRONIC, and as

AMENDED COMPLAINT FOR DAMAGES
CASE NO. 13-01679

1    a result of the  negligence, callousness and the other wrongdoing and misconduct of

2    MEDTRONIC, as described herein:

3        298.   Plaintiff JENNIFER HOUSTON has been injured and suffers injuries

4    to her body and mind, the exact nature of which are not completely known to date;

5        299.   Plaintiff JENNIFER HOUSTON has sustained economic losses,

6    including loss of earnings and diminution of the loss of earning capacity, the exact

7    amount of which is presently unknown.

8        300.   Plaintiff JENNIFER HOUSTON will be required to incur additional

9    medical expenses in the future to care for herself as a result of the injury and

10   damages she has suffered.

11       301.   Plaintiff is therefore entitled to damages in an amount to be proven at

12   trial, together with interest thereon and costs.

13       302.   Defendant's conduct as alleged above was malicious, intentional and

14   outrageous and constitutes a willful and wanton disregard for the rights and safety

15   of others.  Such conduct was directed specifically at Plaintiff and as such, warrants

16   an imposition of punitive damages.

17                              **THIRD CAUSE OF ACTION**
                           **Strict Products Liability – Design Defect**
18                     **(By Plaintiff against the MEDTRONIC Defendants)**

19       303.   Plaintiff incorporates by reference all previous and subsequent

20   paragraphs of this Amended Complaint as if fully set forth here and further alleges

21   as follows:

22       304.   Defendants' Infuse® device was defectively designed at the time that it

23   left the Defendants' control and was placed into the stream of commerce in

24   California.  The device reached Plaintiff without a substantial change in the

25   condition in which it was sold.

26       305.   Defendants' Infuse® device was defectively designed because it was

27   designed for sale without the LT-CAGE™ and, by promoting and selling it as such,

28   MEDTRONIC has unlawfully designed, manufactured, marketed and sold a new

1    device for which the FDA never weighed the risk versus the benefit and never

2    approved.  Moreover, this new device presents risks and dangers that render it

3    defective.

4         306.   Defendants' Infuse® device was defectively designed because the

5    design was unsafe when used in the manner promoted by Defendants and/or in a

6    manner reasonably foreseeable by Defendants.  The Infuse® product failed to

7    perform as safely as an ordinary consumer would expect when used, as it was

8    promoted by MEDTRONIC for use off-label without an LT-Cage™® and

9    placement posteriorly or laterally in lumbar spine fusion surgeries.

10        307.   Defendants' Infuse® device was defectively designed because the risks

11   of danger in the design outweigh the benefits of the design.

12        308.   The Infuse® product was designed in a way that caused users to suffer

13   injuries including, but not limited to, pain and weakness in limbs, radiculitis,

14   ectopic bone formation, osteolysis, and poorer global outcomes than equally-

15   effective, alternative designs and treatments.

16        309.   The foreseeable risks of harm posed by using the Infuse® product in a

17   manner promoted by Defendants could have been reduced or avoided by adopting a

18   reasonably alternative design.  Defendants did not adopt a design that would have

19   rendered the Infuse® product reasonably safe.

20        310.   Plaintiff and Plaintiff's physicians used Infuse® in a manner intended

21   and reasonably foreseeable by Defendants.

22        311.   Plaintiff was not aware of the aforementioned defects at any time prior

23   to the injuries caused by the Infuse®.

24        312.   As a legal and proximate result of the aforementioned defects of

25   Infuse®, Plaintiff has sustained the injuries and damages set forth herein.

26        313.   Plaintiff is therefore entitled to damages in an amount to be proven at

27   trial, together with interest thereon and costs.

28

AMENDED COMPLAINT FOR DAMAGES
CASE NO. 13-01679

## FOURTH CAUSE OF ACTION
### Strict Product Liability – Misrepresentation
#### (By Plaintiff against the MEDTRONIC Defendants)

314.    Plaintiff incorporates by reference all previous and subsequent paragraphs of this Amended Complaint as if fully set forth here and further alleges as follows:

315.    Specific defects in the Infuse® product, as specified above in this Complaint, rendered it defective and unreasonably dangerous.

316.    At all relevant times, Defendants were engaged in the business of selling Infuse® for resale or use, and in fact did sell the Infuse® device used by Plaintiff's implanting surgeon.  In the course of marketing Infuse®, the MEDTRONIC Defendants made untrue representations of material facts and omitted material information to Plaintiff, Plaintiff's physicians, and the public at large.  The MEDTRONIC Defendants sponsored biased medical trials, reports, and articles that wrongfully and inaccurately claimed that the dangers inherent to off-label use of Infuse® did not exist or were significantly less than the actual dangers.  The MEDTRONIC Defendants made these misrepresentations and omissions to guide doctors and physicians in their purchase and use of Infuse®.

317.    Plaintiff and Plaintiff's physicians would not have purchased and made off-label use of Infuse® without an LT-Cage™® and placement of Infuse® posteriorly or laterally for a lumbar spine fusion surgery had they known of the true safety risks related to Infuse®.

318.    Defendants were negligent in making the untrue misrepresentations and omitting material information because Defendants knew, or had reason to know, of the actual, unreasonable dangers and defects in their Infuse® product.

319.    Plaintiff and Plaintiff's physicians would reasonably be expected to use Infuse®.  Defendants intended to induce Plaintiff and Plaintiff's physicians to rely on their misrepresentations and omissions to use Infuse® in an off-label manner.

320.    Plaintiff and Plaintiff's physicians were justified in relying, and did rely, on the misrepresentations and omissions about the safety risks related to Infuse® in deciding to make off-label use of Infuse® without an LT-Cage™® and placement of Infuse® posteriorly or laterally for a lumbar spine fusion surgery.

321.    As the direct, producing, proximate and legal result of the Defendants' misrepresentations, Plaintiff has suffered severe physical pain, medical and hospital expenses, lost wages, pain and suffering, and pecuniary loss.

322.    As a result of the off-label use and failure to warn of the risks of off-label use of Infuse® as manufactured, sold and supplied by MEDTRONIC, and as a result of the negligence, callousness and the other wrongdoing and misconduct of MEDTRONIC, as described herein:

323.    Plaintiff JENNIFER HOUSTON has been injured and suffers injuries to her body and mind, the exact nature of which are not completely known to date;

324.    Plaintiff JENNIFER HOUSTON has sustained economic losses, including loss of earnings and diminution of the loss of earning capacity, the exact amount of which is presently unknown.

325.    Plaintiff JENNIFER HOUSTON will be required to incur additional medical expenses in the future to care for herself as a result of the injury and damages she has suffered.

326.    Plaintiff is therefore entitled to damages in an amount to be proven at trial, together with interest thereon and costs.

327.    Defendant's conduct as alleged above was malicious, intentional and outrageous and constitutes a willful and wanton disregard for the rights and safety of others.  Such conduct was directed specifically at Plaintiff and as such, warrants an imposition of punitive damages.

1

**FIFTH CAUSE OF ACTION**
**Product Liability – Negligence**
**(By Plaintiff against the MEDTRONIC Defendants)**

2

3      328.    Plaintiff incorporates by reference all previous and subsequent

4  paragraphs of this Amended Complaint as if fully set forth here and further alleges

5  as follows:

6      329.    Defendants marketed their Infuse® product to and for the benefit of

7  Plaintiff, and additionally marketed it to Plaintiff's physicians, and these

8  Defendants knew or should have known that Plaintiff and Plaintiff's physicians

9  would use their product, including for the off-label use of Infuse® without an LT-

10 Cage™® and the placement of  Infuse® posteriorly or laterally in lumbar spine

11 fusion.

12     330.    Defendants owed Plaintiff and Plaintiff's physicians duties to exercise

13 reasonable or ordinary care under the circumstances in light of the generally

14 recognized and prevailing best scientific knowledge.

15     331.    Defendants had a confidential and special relationship with Plaintiff

16 due to (a) Defendants' vastly superior knowledge of the health and safety risks

17 relating to Infuse®, and (b) Defendants' sole and/or superior knowledge of their

18 dangerous and irresponsible practices of improperly promoting to physicians the

19 off-label use of Infuse® without an LT-Cage™® and the placement of Infuse®

20 posteriorly or laterally in lumbar spine surgeries.

21     332.    As a result, Defendants had an affirmative duty to fully and adequately

22 warn Plaintiff and Plaintiff's physicians of the true health and safety risks related to

23 the off-label use of Infuse®, and Defendants had a duty to disclose their dangerous

24 and irresponsible practices of improperly promoting to physicians the off-label use

25 of Infuse® without an LT-Cage™® and the placement of Infuse® posteriorly or

26 laterally for lumbar spine surgeries.  Independent of any special relationship of

27 confidence or trust, Defendants had a duty not to conceal the dangers of the off-

28 label use of Infuse® to Plaintiff and Plaintiff's physicians.

333.    Misrepresentations made by Defendants about the health and safety of Infuse® independently imposed a duty upon Defendants to fully and accurately disclose to Plaintiff and Plaintiff's physicians the true health and safety risks related to Infuse®, and a duty to disclose their dangerous and irresponsible off-label promotion and marketing practices.

334.    Through the conduct described in the foregoing and subsequent paragraphs of this Complaint, Defendants breached their duties to Plaintiff and to Plaintiff's physicians.

335.    The following sub-paragraphs summarize, inter alia, Defendants' breaches of duties to Plaintiff and Plaintiff's physicians and describe categories of acts or omissions constituting breaches of duty by these Defendants.  Each and/or any of these acts or omissions establishes an independent basis for these Defendants' liability in negligence:

a.    Unreasonable and improper promotion and marketing of Infuse® to physicians, including but not limited to the promotion and marketing of Infuse® for off-label use without an LT-Cage™® in lumbar spine fusion surgeries;

b.    Failure to warn physicians and Plaintiff of the dangers associated with Infuse® when used off-label without an LT-Cage™®  and placed posteriorly or laterally in lumbar spine surgery including, but not limited to, pain and weakness in limbs, radiculitis, ectopic bone formation, osteolysis, and poorer global outcomes than alternative treatments;

c.    Failure to exercise reasonable care by not complying with federal law and regulations applicable to the sale and marketing of Infuse®; and

d.    Failure to exercise reasonable care to prevent Infuse® from creating an unreasonable risk of harm to Plaintiff and other consumers who might reasonably be expected to be harmed by Infuse® while it was being used in the manner the MEDTRONIC Defendants should have reasonably expected.

336.    Defendants knew, or should have known, that, due to their failure to use reasonable care, Plaintiff and Plaintiff's physicians would use and did use Infuse®, to the detriment of Plaintiff's health, safety and well-being.

337.    As the direct, producing, proximate and legal result of the Defendants' negligence, Plaintiff has suffered severe physical pain, medical and hospital expenses, lost wages, pain and suffering, and pecuniary loss.

338.    As a result of the off-label use and MEDTRONIC's negligence, callousness and the other wrongdoing and misconduct of MEDTRONIC, as described herein:

339.    Plaintiff JENNIFER HOUSTON has been injured and suffers injuries to her body and mind, the exact nature of which are not completely known to date;

340.    Plaintiff JENNIFER HOUSTON has sustained economic losses, including loss of earnings and diminution of the loss of earning capacity, the exact amount of which is presently unknown.

341.    Plaintiff JENNIFER HOUSTON will be required to incur additional medical expenses in the future to care for herself as a result of the injury and damages she has suffered.

342.    Plaintiff is therefore entitled to damages in an amount to be proven at trial, together with interest thereon and costs.

343.    Defendant's conduct as alleged above was malicious, intentional and outrageous and constitutes a willful and wanton disregard for the rights and safety of others.  Such conduct was directed specifically at Plaintiff and as such, warrants an imposition of punitive damages.

## SIXTH CAUSE OF ACTION
### Breach of Express Warranty
### (By Plaintiff against the MEDTRONIC Defendants)

344.    Plaintiff incorporates by reference all previous and subsequent paragraphs of this Amended Complaint as if fully set forth here and further alleges as follows:

345.   At all times herein mentioned, the MEDTRONIC Defendants utilized journal articles, advertising media, sales representatives/consultants and paid Key Opinion Leaders to urge the use, purchase, and utilization of the off-label use of Infuse Bone Graft and expressly warranted to physicians and other members of the general public and medical community that such off-label uses, including uses in lumbar fusion procedures, were safe and effective.

346.   In doing so, MEDTRONIC made specific misrepresentations to Dr. Perri and, likely other physicians, involved in caring for JENNIFER HOUSTON.

347.   Defendants knew or, in the exercise of reasonable diligence, should have known that such off-label uses had the serious side effects set forth earlier in this Amended Complaint.

348.   Plaintiff is informed and believes and based thereon alleges that her treating surgeon relied on Defendants' express warranty representations regarding the safety and efficacy of off-label use of Infuse®, but such off-label uses, including uses in lumbar fusion procedures, were not effective, safe, and proper for the use as warranted in that Infuse® was dangerous when put to these promoted uses.

349.   Defendants thus breached their express warranty which was a direct and proximate cause of Plaintiff's injuries and damages.

350.   Though Plaintiff JENNIFER HOUSTON, personally, did not provide MEDTRONIC with pre-lawsuit notification regarding the breach of its express warranty representations, she did not purchase Infuse® directly from MEDTRONIC, but did so through her health care providers.

351.   As a result of the breach of warranty and the other wrongdoing and misconduct of MEDTRONIC, as described herein:

352.   Plaintiff JENNIFER HOUSTON has been injured and suffers injuries to her body and mind, the exact nature of which are not completely known to date;

AMENDED COMPLAINT FOR DAMAGES
CASE NO. 13-01679

1    353.   Plaintiff JENNIFER HOUSTON has sustained economic losses,

2    including loss of earnings and diminution of the loss of earning capacity, the exact

3    amount of which is presently unknown.

4    354.   Plaintiff JENNIFER HOUSTON will be required to incur additional

5    medical expenses in the future to care for herself as a result of the injury and

6    damages she has suffered.

7    355.   Plaintiff is therefore entitled to damages in an amount to be proven at

8    trial, together with interest thereon and costs.

9    356.   Defendant's conduct as alleged above was malicious, intentional and

10   outrageous and constitutes a willful and wanton disregard for the rights and safety

11   of others.  Such conduct was directed specifically at Plaintiff and as such, warrants

12   an imposition of punitive damages.

13                         **<u>PRAYER FOR RELIEF</u>**

14   WHEREFORE, Plaintiff requests of this Court the following relief:

15   A.    For general damages, in an amount to be proven at the time of trial;

16   B.    For medical, incidental, hospital, psychological care and other

17   expenses, in an amount to be proven at the time of trial;

18   C.    For loss of earnings and earning capacity, in an amount to be proven at

19   the time of trial;

20   D.    For an award of pre-judgment and post-judgment interest as provided

21   by law;

22   E.    For consequential damages, in an amount to be proven at the time of

23   trial;

24   F.    For exemplary or punitive damages as provided by law;

25   G.    For damages for loss of consortium;

26   H.    For an award providing for payment of costs of suit and attorneys'

27   fees;

28   I.    For such other and further relief as this Court may deem just and

-92-                          AMENDED COMPLAINT FOR DAMAGES
                              CASE NO. 13-01679

1    proper.

2

3    Dated:  August 29, 2013

4                                                    By:_____

5                                                              Kent L. Klaudt

6                                                    Kent L. Klaudt (State Bar No. 183903)
                                                     Cecilia Han (State Bar No. 235640)
7                                                    Lisa J. Cisneros (State Bar No. 251473)
                                                     LIEFF CABRASER HEIMANN &
8                                                    BERNSTEIN, LLP
                                                     275 Battery Street, 29th Floor
9                                                    San Francisco, California  94111-3339
                                                     Telephone:  415.956.1000
10                                                   Facsimile:  415.956.1008

11                                                   Steven E. Fineman (State Bar No. 140335)
                                                     Wendy R. Fleishman (*Pro Hac Vice* application
12                                                   anticipated)
                                                     LIEFF, CABRASER, HEIMANN &
13                                                   BERNSTEIN, LLP
                                                     250 Hudson Street, 8th Floor
14                                                   New York, New York  10013-1413
                                                     Telephone:  212.355.9500
15                                                   Facsimile:  212.355.9592

16                                                   *Attorneys for Plaintiff Jennifer Houston*

17

18

19

20

21

22

23

24

25

26

27

28

                                          -93-              AMENDED COMPLAINT FOR DAMAGES
                                                                    CASE NO. 13-01679

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues stated.

Dated:  August 29, 2013          By:_____

                                        Kent L. Klaudt

Kent L. Klaudt (State Bar No. 183903)
Cecilia Han (State Bar No. 235640)
Lisa J. Cisneros (State Bar No. 251473)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, California  94111-3339
Telephone:  415.956.1000
Facsimile:  415.956.1008

Steven E. Fineman (State Bar No. 140335)
Wendy R. Fleishman (*Pro Hac Vice* application anticipated)
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, New York  10013-1413
Telephone: 212.355.9500
Facsimile:  212.355.9592

*Attorneys for Plaintiff Jennifer Houston*

1127055.2

-94-

AMENDED COMPLAINT FOR DAMAGES
CASE NO. 13-01679